Present:  All the Justices

DARYL RENARD ATKINS

v.  Record No. 052348  OPINION BY JUSTICE CYNTHIA D. KINSER
                                    June 8, 2006
COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF YORK COUNTY
N. Prentis Smiley, Jr., Judge


On prior occasions, we have addressed various issues regarding Daryl Renard Atkins' conviction for capital murder and the imposition of the death penalty.  Today, we review a jury verdict finding that Atkins is not mentally retarded and the circuit court's reinstatement of Atkins' death sentence in light of that verdict.  Although Atkins raises numerous assignments of error, we conclude that the circuit court erred in two respects: (1) by admitting testimony from one of the Commonwealth's expert witnesses; and (2) by informing the venire that another jury had already sentenced Atkins to death.  Thus, we will reverse the circuit court's judgment and remand this case for a new proceeding to determine whether Atkins is mentally retarded.

I. Procedural History

In February 1998, a jury convicted Atkins of the November 1996 capital murder of Eric Michael Nesbitt during

the commission of robbery.[1]  See Code § 18.2-31(4).  During

the penalty phase of the bifurcated trial, the jury fixed

Atkins' sentence at death.  Upon review by this Court

pursuant to Code § 17.1-313, we affirmed his conviction for

capital murder, but vacated the imposition of the death

sentence, and remanded the case to the Circuit Court of

York County for a new sentencing hearing.  Atkins v.

Commonwealth, 257 Va. 160, 180, 510 S.E.2d 445, 457 (1999)

(Atkins I).

At the re-sentencing, a different jury again fixed

Atkins' punishment at death on the capital murder

conviction.  The Circuit Court of York County imposed the

death penalty in accordance with the jury verdict.  In the

subsequent review by this Court, we upheld "the imposition

of the death penalty."  Atkins v. Commonwealth, 260 Va.

375, 379, 534 S.E.2d 312, 314 (2000) (Atkins II).

The United States Supreme Court then granted Atkins a

writ of certiorari on the sole issue "[w]hether the

execution of mentally retarded individuals convicted of

capital crimes violates the Eighth Amendment?"  Atkins v.

Virginia, 534 U.S. 809, 809 (2001).  Establishing a

categorical rule that execution of mentally retarded

---

[1] Atkins was also convicted of abduction, robbery, and related firearm charges.  See Code §§ 18.2-48, -58, and -53.1, respectively.

2

individuals is excessive punishment, and therefore violates the Eighth Amendment, the United States Supreme Court reversed our judgment and remanded the case to this Court for further proceedings.  Atkins v. Virginia, 536 U.S. 304, 320-21 (2002) (Atkins III).

In response to the United State Supreme Court's ruling in Atkins III, the General Assembly enacted emergency legislation defining the term "[m]entally retarded" and establishing procedures for determining whether a defendant convicted of capital murder is mentally retarded.  Code §§ 8.01-654.2, 19.2-264.3:1.1, -264.3:1.2, -264.3:3.  Part of that legislation specifically addressed the procedure to be followed in cases when defendants, such as Atkins, had been sentenced to death prior to the decision of the United States Supreme Court in Atkins III and the enactment of the emergency mental retardation legislation.  Code § 8.01-654.2.  Following the enactment of the legislation, and pursuant to the mandate of the United States Supreme Court in Atkins III, this Court remanded Atkins' case to the Circuit Court of York County for the "'sole purpose of making a determination of mental retardation.'"  Atkins v. Commonwealth, 266 Va. 73, 79, 581 S.E.2d 514, 517 (2003) (quoting Code § 8.01-654.2) (Atkins IV).

Upon remand, a third jury found that Atkins did not prove by a preponderance of the evidence that he is mentally retarded under Code § 19.2-264.3:1.1(A).[2]  Based on that verdict, the Circuit Court of York County reinstated Atkins' death sentence.  We awarded Atkins an appeal from the circuit court's judgment pursuant to Rules 5:17 and/or 5:22.

## II. Analysis

Atkins assigns 38 errors to the judgment of the circuit court.  Although he did not brief some of the assignments of error, see Muhammad v. Commonwealth, 269 Va. 451, 478, 619 S.E.2d 16, 31 (2005), cert. denied, ___ U.S. ___ (2006) ("[f]ailure to adequately brief an assignment of error is considered a waiver"), and others are waived for various reasons, we will specifically consider only three assignments of error:

---

[2] The term "[m]entally retarded" is defined as

a disability, originating before the age of 18 years, characterized concurrently by (i) significantly subaverage intellectual functioning as demonstrated by performance on a standardized measure of intellectual functioning administered in conformity with accepted professional practice, that is at least two standard deviations below the mean and (ii) significant limitations in adaptive behavior as expressed in conceptual, social and practical adaptive skills.

Code § 19.2-264.3:1.1(A).

4

No. 3 – the circuit court erred "by informing [the] jurors that, after a prior valid juror determination of sentence was made, the Supreme Court of the United States intervened by ruling that the execution of persons with mental retardation is cruel and unusual punishment, and that their decision regarding mental retardation would determine whether the prior valid juror determination of sentence would actually be imposed;"

No. 13 – the circuit court erred "by sustaining the Commonwealth's objection to the qualifications and expert testimony of Dr. Richard Kelley;" and

No. 15 – the circuit court erred "by overruling [Atkins'] objection to the expert qualification and subsequent testimony of Dr. Stanton E. Samenow as a Commonwealth witness."

We will first address No. 15, then No. 3, and conclude with No. 13.

## A. Dr. Samenow

On the motion of the Commonwealth, pursuant to Code § 19.2-264.3:1.2(F)(1), the circuit court appointed Stanton E. Samenow, Ph.D., a clinical psychologist, to evaluate Atkins "concerning the existence or absence of [Atkins'] mental retardation." The qualifications of an expert appointed at the request of the Commonwealth are governed by subsection A of Code § 19.2-264.3:1.2. That subsection requires that

[t]he mental health expert appointed pursuant to this section shall be (a) a psychiatrist, a clinical psychologist or an individual with a doctorate degree in clinical psychology, (b)

5

skilled in the administration, scoring and interpretation of intelligence tests and measures of adaptive behavior and (c) qualified by experience and specialized training, approved by the Commissioner of Mental Health, Mental Retardation and Substance Abuse Services, to perform forensic evaluations.

At Atkins' mental retardation hearing, the Commonwealth moved to admit Dr. Samenow as an expert in "clinical psychology with a specialty in forensic psychology." On voir dire, Atkins asked Dr. Samenow the following questions regarding his qualifications and the timing of an intellectual functioning test he administered to Atkins:

Q. Can you tell me [Dr. Samenow], do you know what a standardized measure for assessing adaptive behavior is, what that phrase means?

A. Adaptive behavior?

Q. A standardized measure.

A. Yes, it would be giving a test, if such a test were appropriate, to try to assess the person's functioning in life, conceptually, practically, socially.

Q. Could you name a few?

A. The ABS,[3] the test that has been given, I do not give it.

Q. Okay, any others that you know of?

A. No.

---

[3] The correct name of the test is the Adaptive Behavior Assessment System-II (ABAS-II).

6

Q. And have you ever given it?

A. No, I have not.

Q. You've never used one, you say?

A. I have not used the test of adaptive functioning.

Q. Any test of adaptive functioning?

A. That is correct.

Q. Okay. And you administered in 2004 an IQ test; is that correct?

A. Yes.

Q. What's the name of that test?

A. The Weschler Adult Intelligence Scale.

Q. And you know that two days before you administered it, it had already been administered?

A. Oh, I absolutely do.[4]

Q. Is it accepted professional practice to administer that test two days after someone else has administered it?

---

[4] During voir dire, Dr. Samenow testified that he administered a Weschler Adult Intelligence Scale (WAIS-III) to Atkins two days after a clinical psychologist, who testified for Atkins, had given Atkins the test. After Atkins' clinical psychologist administered the WAIS-III, he allegedly advised Atkins not to take the test again. When Dr. Samenow arrived at the prison where Atkins was incarcerated, Atkins informed Dr. Samenow that he had already taken the WAIS-III and did not feel he should take it again. Dr. Samenow was not previously aware of the recent administration of the WAIS-III and elected to repeat it because he did not have another test for intellectual functioning with him.

A.   One knows one's going to get a practice effect and ordinarily one would not.

Q.   Let's stay with the question, please.   Is it accepted professional practice to administer the WAIS two days after someone else has?

A.   Generally not.

After this exchange, Atkins moved to disallow Dr. Samenow's testimony on the grounds that Dr. Samenow had not conducted the evaluation of Atkins in accordance with the provisions of Code § 19.2-264.3:1.1(B)(1) and (2) because he had not assessed Atkins' intellectual functioning in accordance with accepted professional practice and had not administered any standardized measure for assessing adaptive behavior.   In response to a question from the Commonwealth during additional voir dire, Dr. Samenow explained why he did not give a standardized measure of adaptive behavior to Atkins, "I don't think it would have been a valid or reliable measure because the individual, Daryl Atkins, had been incarcerated for quite some time. It would have had to have been retroactive.   I think there are many ways to assess adaptive functioning that would be more informative."

During further cross-examination, Atkins asked Dr. Samenow how many assessments for mental retardation he had performed during his career.   Dr. Samenow responded that

Atkins was the "[f]irst and last."  Atkins continued with

these questions:

> Q.  So you have no experience whatsoever
> administering assessments that are standard – I'm
> sorry, standardized measures generally accepted
> in the field for adaptive behavior, you've never
> done one?
>
> A.  No, I'm constantly assessing adaptive
> behavior, but I have not given these tests of
> adaptive behavior.
>
> . . . .
>
> Q.  All right.  So having never administered one
> of these tests, you have no clinical experience
> or judgment with respect to when, where or how it
> ought to be administered?
>
> A.  Well, if I have never administered the test,
> then I'm not an expert as to the use of those
> tests.

The circuit court then asked Dr. Samenow whether he "really

[felt] comfortable" rendering an opinion regarding Atkins'

mental retardation.  Dr. Samenow answered, "[A]bsolutely I

do, because I have spent a career assessing the functioning

of individuals."

After the voir dire of Dr. Samenow concluded, Atkins

re-iterated his objection to Dr. Samenow's testifying on

the subject of Atkins' mental retardation for the reasons

previously stated and on the additional ground that Dr.

Samenow did not have the qualifications set forth in Code

§ 19.2-264.3:1.2(A).  The circuit court overruled Atkins'

9

motion and determined that Dr. Samenow was qualified to render an opinion on mental retardation.

Atkins now argues, as he did before the circuit court, that Dr. Samenow was not qualified to testify as an expert because he did not meet the requirements of Code § 19.2-264.3:1.2(A), and because he did not conduct his evaluation of Atkins in accordance with the provisions of Code § 19.2-264.3:1.1(B)(1) and (2).  In response, the Commonwealth asserts that the circuit court did not abuse its discretion in allowing Dr. Samenow to testify as an expert on the issue whether Atkins is mentally retarded.  According to the Commonwealth, Dr. Samenow is a licensed clinical psychologist with a specialty in forensic psychology; he has performed hundreds of forensic evaluations; and he explained why he administered an intellectual functioning test to Atkins two days after another clinical psychologist had done so and why he did not use a standardized measure to assess Atkins' adaptive behavior.

As the Commonwealth argues, " '[t]he admission of expert testimony is committed to the sound discretion of the trial judge, and [this Court] will reverse a trial court's decision only where that court has abused its discretion.' "  Tarmac Mid-Atl., Inc. v. Smiley Block Co., 250 Va. 161, 166, 458 S.E.2d 462, 465 (1995) (citation

omitted). But, "[w]here a statute designates express qualifications for an expert witness, the witness must satisfy the statutory criteria in order to testify as an expert." Commonwealth v. Allen, 269 Va. 262, 273, 609 S.E.2d 4, 11 (2005). In passing the emergency mental retardation legislation, the General Assembly required, among other things, that a mental health expert appointed under Code § 19.2-264.3:1.2(A) must be "skilled in the administration, scoring and interpretation of . . . measures of adaptive behavior." (Emphasis added.) We are bound by the plain meaning of the unambiguous language used by the General Assembly. Britt Constr., Inc. v. Magazzine Clean, LLC, 271 Va. 58, 62, 623 S.E.2d 886, 888 (2006).

During voir dire, Dr. Samenow acknowledged that he had never administered a standardized measure of adaptive behavior. Although Dr. Samenow explained that he constantly assesses individuals' adaptive behavior, he admitted that, since he has never administered such tests, he is not an expert as to the use of them. In other words, Dr. Samenow is not "skilled" in the administration of measures of adaptive behavior. Accordingly, he would also lack the requisite expertise in scoring and interpreting such tests. Thus, on the record before us, we conclude that the Commonwealth failed to establish that Dr. Samenow

11

possessed the necessary qualifications set forth in Code § 19.2-264.3:1.2(A) and therefore, the circuit court abused its discretion by allowing Dr. Samenow to testify and express an expert opinion with regard to whether Atkins is mentally retarded.

The Commonwealth argues, however, that any such error was harmless because of the overwhelming proof that Atkins is not mentally retarded. In Clay v. Commonwealth, 262 Va. 253, 546 S.E.2d 728 (2001), this Court adopted the following test for non-constitutional harmless error:

> "If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but slight effect, the verdict and the judgment should stand . . . . But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected . . . . If so, or if one is left in grave doubt, the conviction cannot stand."

Id. at 260, 546 S.E.2d at 731-32 (quoting Kotteakos v. United States, 328 U.S. 750, 764-65 (1946)).

Whether Atkins is mentally retarded was a factual issue for the jury to determine. The Commonwealth presented testimony from Dr. Samenow and one other forensic clinical psychologist, both of whom opined that Atkins is not mentally retarded. In contrast, two clinical

12

psychologists testified on behalf of Atkins and opined that he does meet the statutory requirements for mental retardation.[5]  This evidence presented the jury with the classic "battle of the experts."  It was therefore the jury's task to resolve the conflicts in the expert testimony and to decide which expert or experts were worthy of belief.  See Todd v. Edwin L. Williams, II, M.D., LTD., 242 Va. 178, 181, 409 S.E.2d 450, 452 (1991).  Since the jury decided that Atkins is not mentally retarded, it appears that the jury placed more weight on the testimony of at least one of the Commonwealth's two expert witnesses. As there is no way for this Court to determine whose testimony the jury actually accepted in reaching its verdict, we cannot say that the circuit court's error in allowing Dr. Samenow to testify did not influence the jury. Therefore, the error was not harmless.

Our conclusion, however, does not mean that a mental health expert appointed to assess a defendant's mental retardation must administer a standardized measure of adaptive behavior to the defendant in to order to testify as an expert on the issue of the defendant's mental retardation.  To the contrary, such expert needs only to be

---

[5] Another clinical psychologist testifying for Atkins opined that Atkins has substandard intellectual functioning.

"skilled in the administration, scoring and interpretation of intelligence tests and measures of adaptive behavior." Code § 19.2-264.3:1.2(A). The requirements for assessing a defendant's mental retardation are different and are set forth in Code § 19.2-264.3:1.1. One requirement is that "[t]he assessment shall include at least one standardized measure generally accepted by the field of psychological testing for assessing adaptive behavior and appropriate for administration to the particular defendant being assessed, unless not feasible." Code § 19.2-264.3:1.1(B)(2).

Therefore, if an expert, skilled in administering, scoring and interpreting standardized measures of adaptive behavior, determines in his or her opinion that such a test is not appropriate for a particular defendant or that administering a standardized measure of adaptive behavior is not feasible, the expert can still testify as to the defendant's mental retardation and explain why a measure of adaptive behavior was not administered to the defendant. The decision about which tests to administer to a defendant and the manner in which they are given goes to the weight to be accorded an expert's opinion regarding mental retardation, not to the admissibility of the opinion.[6]  See

_____

[6] The same conclusion applies to Dr. Samenow's decision to administer the WAIS-III two days after another clinical

14

<u>Hetmeyer v. Commonwealth</u>, 19 Va. App. 103, 108-09, 448 S.E.2d 894, 898 (1994) ("A challenge to an 'experts . . . methods and determinations . . ., even by other experts, does not render inadmissible expert opinion based on those . . . methods and computations' but goes to the 'weight of the evidence,' raising 'factual questions to be determined by the jury.' " (citations omitted)).  <u>Cf.</u> <u>Bitar v. Rahman</u>, 272 Va. ___, ___, ___ S.E.2d ___, ___ (2006) (this day decided) (certain objections challenged "the admissibility of evidence rather than the sufficiency of evidence").

### B. Juror Information

During pretrial proceedings, Atkins moved the circuit court to refrain from informing the jury about any of his prior offenses, including the underlying capital murder conviction and death sentence, and the fact that he is on "death row."  He also requested that the jurors not be told the consequences of their verdict, i.e., that finding Atkins mentally retarded means his death sentence would not be carried out.

The circuit court overruled Atkins' motion on the premise that it was in the best interest of the parties if

---

psychologist had given the test to Atkins.  Contrary to Atkins' argument, the mere fact that Dr. Samenow did not administer the WAIS-III to Atkins in accordance with accepted professional practice would not render his opinion inadmissible.

the jury knew the truth surrounding the proceeding.[7]  The

circuit court reasoned that the jury needed to be aware of

the consequences of its actions.  In accordance with its

ruling, the circuit court gave the following information to

the venire:

> This case is a case that is going to be unique in the annals of judicial history.  Daryl Atkins, in 1996, was charged with committing the offense of capital murder, abduction, and robbery and use of firearms in those related offenses.
>
> In 1998 he pled not guilty, was found guilty and ultimately sentenced to the ultimate penalty of death and several other lengthy prison terms.
>
> His case was appealed throughout our judicial system ultimately reaching the United States Supreme Court.  The United States Supreme Court determined that by a consensus of states the law now would be that it would be cruel and unusual punishment, pursuant to the Eighth Amendment of the United States Constitution, to execute someone who may be mentally retarded.  May be mentally retarded.  They remanded the issue of mental retardation to the Virginia Supreme Court who ultimately remanded it to this Court to make a factual determination as to whether Mr. Atkins is mentally retarded.  If he is mentally retarded, and that is the fact issue that you will determine, another jury has already made the determination as to what would happen to him.  If he is mentally retarded, by law, his sentence would now be commuted to life in prison.  If you find that he is not mentally retarded then another jury has determined what would happen to him; that is, that he would be executed.

---

[7] The circuit court did direct the parties not to inform the jury that Atkins is on "death row."  The court also granted the Commonwealth's motion to "death qualify" prospective jurors.

On appeal, Atkins argues that the information provided to the jury was prejudicial and distracted it from the sole purpose of the proceeding.  The Commonwealth responds that it was imperative that the jurors be questioned about any bias with regard to the death penalty and that, with such questioning, the circuit court also had to inform them as it did about Atkins' capital murder conviction and death sentence, the change in the law, and the consequences of their verdict.  The Commonwealth also points out that much of the information given to the jurors was the same information that a jury would know in a case where a defendant, unlike Atkins, raises the question of mental retardation before trial in accordance with Code § 19.2-264.3:1.2(E).

Under the procedures established by the General Assembly, the issue of mental retardation "shall be determined by the jury as part of the <u>sentencing proceeding</u>."  Code § 19.2-264.3:1.1(C) (emphasis added). Thus, as the Commonwealth argues, a jury deciding the question of a defendant's mental retardation normally would have already found the defendant guilty of capital murder. Furthermore, when a defendant charged with capital murder raises the issue of mental retardation, the verdict forms provided to the jury must include not only the forms

17

specified in Code § 19.2-264.4 but also the forms set out in Code § 19.2-264.3:1.1(D).  One of the latter verdict forms states:

> "We, the jury, on the issue joined, having found the defendant guilty of (here set out the statutory language of the offense charged), and that the defendant has proven by a preponderance of the evidence that he is mentally retarded, fix his punishment at (i) imprisonment for life or (ii) imprisonment for life and a fine of $_____."

Code § 19.2-264.3:1.1(D)(1).  It is evident from this verdict form that a jury would also know that a finding of mental retardation means the defendant would not be subject to the death penalty.  Thus, to the extent the circuit court told the jurors in this case that Atkins had been convicted of capital murder and that he would not be subject to the death penalty if he is mentally retarded, the circuit court did not err.

The circuit court, however, went beyond the scope of information that a jury would normally know when deciding whether a defendant convicted of capital murder is mentally retarded.  The circuit court also informed the jury that another jury had already decided that Atkins should receive the death penalty.  In other words, the jury knew that, if it found Atkins mentally retarded, it would in effect be nullifying another jury's verdict to sentence Atkins to death.  In a normal context, a jury deciding the question

of a defendant's mental retardation, however, would not have already decided that the defendant should receive the death penalty. In accordance with the procedures established by the General Assembly, such a jury would simultaneously consider issues regarding mental retardation and imposition of the death penalty in the same sentencing proceeding. Thus, the jury in this case was not entitled to know the sentencing decision of another jury just as a jury in a re-sentencing hearing, such as occurred in Atkins II, is not entitled to know a prior jury's sentencing verdict.

Thus, we agree with Atkins. The fact that the jury knew a prior jury had sentenced Atkins to death prejudiced his right to a fair trial on the issue of his mental retardation. See Lewis v. Commonwealth, 269 Va. 209, 215, 608 S.E.2d 907, 910-11 (2005) (defendant was denied a fair trial where Commonwealth repeatedly made unfounded, prejudicial remarks). "Retrospective mental retardation proceedings in a capital case are unlike any other jury proceedings, and require great care in order to avoid over-whelming prejudice to the defendant." Lambert v. State, 126 P.3d 646, 653 (Okla. Crim. App. 2005).

In light of the circuit court's error in giving this information to the jury and in admitting Dr. Samenow's

testimony, it is necessary to remand this case to the circuit court for a new proceeding to determine whether Atkins is mentally retarded. On remand, the circuit court shall inform the new venire as follows:

> Daryl Atkins has been convicted of the offense of capital murder during the commission of robbery. The United States Supreme Court and the General Assembly of Virginia have determined that a defendant convicted of capital murder, but who is mentally retarded, is not subject to the imposition of the death penalty. It is your duty to determine whether Atkins is mentally retarded.[8]

## C. Dr. Kelley

Because this case must be remanded, we will address one additional issue that could arise during the new proceeding in the circuit court, i.e., whether the circuit court erred by refusing to allow Dr. Kelley to testify. See Holley v. Pambianco, 270 Va. 180, 185, 613 S.E.2d 425, 428 (2005). Atkins sought to introduce testimony from Dr. Kelley as an expert in the field of pediatrics and genetics. Upon objection by the Commonwealth, the circuit

---

[8] Since prospective jurors will be told that a mentally retarded defendant is not subject to the imposition of the death penalty, the circuit court, as it did previously, must ask the venire about any bias regarding the death penalty.

If the jury determines that Atkins is mentally retarded, the circuit court must then direct the jury to fix Atkins' punishment at (i) imprisonment for life or (ii) imprisonment for life and a fine of $_____. See Code § 19.2-264.3:1.1(D).

20

court held that Dr. Kelley's testimony was not relevant to the determination of mental retardation. We agree.

During a proffer of his testimony, Dr. Kelley explained that Atkins was born with a number of physical abnormalities that could predispose him to have cognitive or developmental disabilities. Because of the physical abnormalities, Dr. Kelley opined that Atkins suffers from a genetic syndrome. The syndrome, which Dr. Kelley called "Atkins Syndrome," is a "private syndrome," meaning that he "could not find a syndrome that had been described as a genetic disorder with exactly the same combination of abnormalities."

Dr. Kelley nevertheless testified that Atkins' physical abnormalities are significant because "more than half of the children who have multiple physical abnormalities will also have some developmental abnormalities." Dr. Kelley noted that it is necessary, however, to probe further to ensure that "this is a genetic abnormality as opposed to just an extreme abnormal [sic]." Consequently, Dr. Kelley performed genetic testing on Atkins to see if he had any chromosomal abnormalities that would confirm a genetic syndrome. Dr. Kelley was unable to find any. But, he stated the lack of chromosomal evidence was not uncommon and did not rule out a genetic syndrome.

21

Finally, Dr. Kelley opined about whether Atkins suffers from a genetic syndrome and was at risk for developing a cognitive disability:

Q.   Now, were you able to determine to a medical certainty whether . . . Daryl Atkins suffers from a genetic syndrome?

A.   I could not identify a specific genetic syndrome.  Given the findings, I think any geneticist would pursue further by trying to identify – doing other genetic studies on the family with the assumption that there is a genetic lesion explaining the family's – the constellation of the abnormalities.  So we stopped at a certain point, but certainly it would be indicated to pursue this further with modern techniques to try to identify what gene or group of genes is abnormal.

Q.   Again, taking into account the physical findings and the finding about the difficulty in retaining bike riding skills –

A.   Right.

Q.   – do you have an opinion to a medical certainty about whether this constellation of information created a risk factor in Daryl Atkins' life for the development of a cognitive disability?

A.   Yes, indeed.  That the association of risk factors – the physical findings being a risk factor for brain involvement and the history of a very unusual type of learning disability.

It is evident from this testimony that Dr. Kelley assumed that, because Atkins has certain physical abnormalities, he suffers from a genetic syndrome causing cognitive disabilities.  But, Dr. Kelley did not confirm

22

this assumption through genetic testing or any other accepted method of scientific proof. As Atkins admitted during a colloquy with the circuit court, the most that Dr. Kelley could opine within a reasonable degree of medical probability was that Atkins' physical abnormalities are risk factors that could lead to developmental and cognitive disabilities. Such an opinion was speculative and without an adequate factual foundation. Expert testimony is inadmissible if it is "speculative or founded on assumptions that have an insufficient factual basis." Tittsworth v. Robinson, 252 Va. 151, 154, 475 S.E.2d 261, 263 (1996). Dr. Kelley also attempted to compare Atkins with individuals having both physical abnormalities and developmental abnormalities without foundation evidence that actually placed Atkins in that category of individuals. See Keesee v. Donigan, 259 Va. 157, 162, 524 S.E.2d 645, 648 (2000) (expert testimony about principles relating to an average driver was inadmissible in the absence of evidence placing the defendant in the category of the average driver). Thus, we conclude that the circuit court did not abuse its discretion when it refused to allow Dr. Kelley to testify.

### III. CONCLUSION

23

For these reasons, we will reverse the judgment of the circuit court and remand this case for a new proceeding, consistent with this opinion, to determine whether Atkins is mentally retarded.

Reversed and remanded.