*321 OPINION
SHEDD, Circuit Judge:
In Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), the Supreme Court held that the Eighth Amendment prohibits the execution of mentally retarded persons. Relying on Atkins, Virginia capital inmate Darick Demorris Walker filed a petition for federal habeas corpus relief seeking to prevent his execution. Finding that Walker failed to prove that he is mentally retarded under Virginia law,[1] the district court denied the petition, and he now appeals. For the following reasons, we affirm the judgment of the district court.
I
In 1998, the Commonwealth of Virginia convicted Walker of capital murder for the killings of two men within a three-year period. Walker was sentenced to death, and his conviction and capital sentence were affirmed. Walker v. Commonwealth, 258 Va. 54, 515 S.E.2d 565 (1999), cert. denied, 528 U.S. 1125, 120 S.Ct. 955, 145 L.Ed.2d 829 (2000). The underlying facts of his crimes, which are not pertinent to this appeal, are set forth in the state supreme court’s opinion. See 515 S.E.2d at 568-69.
After unsuccessfully pursuing state post-conviction relief, Walker filed the first of two petitions for habeas corpus relief in the district court. The claims involved in Walker’s first habeas petition are not before us in this appeal. See Walker v. Kelly, 589 F.3d 127 (4th Cir.2009) (affirming the denial of Walker’s first habeas petition).
While Walker’s first habeas petition was pending in the district court, the Supreme Court decided Atkins. Concluding that a national consensus had developed against the execution of the mentally retarded, the Court held that the Eighth Amendment bars their execution. In doing so, the Court noted:
To the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded.... Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus.
Atkins, 536 U.S. at 317, 122 S.Ct. 2242. However, the Court “did not provide definitive procedural or substantive guides for determining when a person who claims mental retardation will be so impaired as to fall” within the class of defendants ineligible for capital punishment. Bobby v. Bies, - U.S. -, 129 S.Ct. 2145, 2150, 173 L.Ed.2d 1173 (2009) (internal punctuation omitted). Instead, the Court expressly left to the states the “ ‘task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.’ ” Atkins, 536 U.S. at 317, 122 S.Ct. 2242 (quoting Ford v. Wainwright, 477 U.S. 399, 405, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986)). “States ... have responded to that challenge by adopting theiy own measures for adjudicating claims of mental retardation.” Schriro v. Smith, 546 U.S. 6, 7, 126 S.Ct. 7, 163 L.Ed.2d 6 (2005).
The Virginia General Assembly responded to Atkins by enacting a statutory scheme to determine capital defendants’ claims of mental retardation. Pertinent to this case, the General Assembly mandated *322 that a capital defendant has the burden of proving mental retardation by a preponderance of the evidence, Va.Code § 19.2-264.3:1.1(C), and it defined the term “mentally retarded” as:
[A] disability, originating before the age of 18 years, characterized concurrently by (i) significantly subaverage intellectual functioning as demonstrated by performance on a standardized measure of intellectual functioning administered in conformity with accepted professional practice, that is at least two standard deviations below the mean and (ii) significant limitations in adaptive behavior as expressed in conceptual, social and practical adaptive skills.
Va.Code § 19.2-264.3:1.1(A). For a capital defendant (such as Walker) who had completed his direct appeal and state habeas proceeding as of the effective date of the legislation, the General Assembly specified that “he shall not be entitled to file any further habeas petitions in the [Virginia] Supreme Court and his sole remedy shall lie in federal court.” Va.Code § 8.01-654.2.
Walker initially presented his Atkins claim in his appeal from the denial of his first federal habeas petition. Construing his Atkins claim in that appeal as a motion for authorization to file a successive habeas corpus petition, we granted Walker authorization. See Walker v. True, 67 Fed.Appx. 758, 770-71 (4th Cir.) (“Walker v. True I”), vacated on other grounds, 540 U.S. 1013, 124 S.Ct. 567, 157 L.Ed.2d 426 (2003). Walker then filed his second federal habeas petition (which is now before us), and the Commonwealth moved to dismiss that petition. The district court granted the Commonwealth’s motion and entered judgment against Walker.
On appeal, we vacated the judgment, concluding that the district court erred by dismissing the petition without holding an evidentiary hearing; consequently, we remanded the case for an evidentiary hearing to address whether Walker is mentally retarded under Virginia law. See Walker v. True II, 399 F.3d at 327. However, although we ruled in Walker’s favor concerning his right to have an evidentiary hearing, we rejected his contention that he was entitled to have a jury decide whether he is mentally retarded. As we explained:
[T]he portion of the Virginia statute that refers to a jury determination does so in the context of the appropriate procedure at sentencing in state court. It does not bear on the appropriate federal procedure governing Walker’s Eighth Amendment claim that is based, in part, upon Virginia’s definition of mentally retarded.
399 F.3d at 324-25.
On remand, the district court held a multi-day evidentiary hearing without a jury, during which the parties introduced a substantial amount of evidence on the issue of Walker’s mental retardation. This evidence included Walker’s scores on various standardized tests; documentary evidence from school, prison, and medical records; and declarations from his family, acquaintances, and fellow inmates. The court also heard testimony from several witnesses, including designated experts who testified on the issue of Walker’s mental retardation. Eventually, the court denied Walker’s petition. This appeal followed.
II
In accordance with Virginia law, Walker presented his Atkins claim only in federal court; therefore, the standard of review mandated by AEDPA does not apply. See Walker v. True II, 399 F.3d at 319. Instead, we review the district court’s legal conclusions de novo and its *323 factual findings for clear error. Green v. Johnson, 515 F.3d 290, 301 (4th Cir.), cert. denied, — U.S. -, 128 S.Ct. 2999, — L.Ed.2d -(2008). Because the determination of mental retardation involves a question of fact, Atkins v. Commonwealth, 272 Va. 144, 631 S.E.2d 93, 98 (2006), we review the district court’s finding that Walker is not mentally retarded for clear error, Holladay v. Allen, 555 F.3d 1346, 1353 (11th Cir.2009). When we review factual findings under this standard,
Our scope of review is narrow; we do not exercise de novo review ... or substitute our version of the facts for that found by the district court. Instead, “[i]f the district court’s account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.” Thus, facts found by the district court are conclusive on appeal “unless they are plainly wrong.” A factual finding by the district court may be reversed only if, “although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.”
Walton v. Johnson, 440 F.3d 160, 173-74 (4th Cir.2006) (en banc) (citations omitted).
A.
To prevail on his Atkins claim under Virginia law, Walker must meet the comprehensive definition of the statutory term “mentally retarded.” Green, 515 F.3d at 298. Thus, he must prove by a preponderance of the evidence that he has a disability that originated before the age of 18, and that the disability is characterized by (1) significantly subaverage intellectual functioning as demonstrated by performance on a standardized measure of intellectual functioning administered in conformity with accepted professional practice, that is at least two standard deviations below the mean (“the I.Q. prong”) and (2) significant limitations in adaptive behavior as expressed in conceptual, social, and practical adaptive skills (“the adaptive prong”). Although Walker devotes much of his appeal to the district court’s analysis of the I.Q. prong, it is unnecessary for us to address those arguments because we conclude that the court did not clearly err in rejecting his claim on the adaptive prong. See Green, 515 F.3d at 301 (recognizing that the failure to prevail on the adaptive prong necessarily defeats an Atkins claim).
As noted, the adaptive prong focuses on whether a person can prove “significant limitations in adaptive behavior” and it measures such behavior by looking to the person’s conceptual, social, and practical adaptive skills. Conceptual adaptive skills “involve skills pertaining to language, reading and writing, money concepts, and self-direction;” social adaptive skills “are measured by interpersonal skills and responsibility, self-esteem, gullibility and naivete, and ability to follow rules and obey laws;” and practical adaptive skills “involve activities relevant to daily living, occupational skills, and maintenance of a safe environment.” Green, 515 F.3d at 302.[2] During the evidentiary hearing the parties presented a substantial amount of evidence pertaining to Walker’s adaptive behavior. We now turn to a brief summary of that evidence.
(1)
As evidence of his conceptual limitations, Walker pointed to his difficulties reading *324 and writing. He presented evidence that “he never reads or looks at books or magazines,” J.A. 310, and he also claimed that he relies on other inmates to help him read, write, and fill out forms. Moreover, affidavits from family members note that Walker would ask others to read letters to him, and his brother’s affidavit related a particularly telling moment: “When I was in Ninth grade and Darick was seventeen years old, I remember coming back from school to find Darick at home with a bunch of blank job applications. I had to fill them out for him.” J.A. 159.
Walker also pointed to his inability to handle money and his heavy reliance on others to get by in the world. His family members noted that, while growing up, Walker never knew what to do with money. Moreover, his fellow inmates claimed that he relies on them for help in maintaining his account with the prison commissary. His experts also observed that “[a]fter leaving home, Mr. Walker consistently relied on others to help him negotiate the basics of everyday life,” J.A. 378, and that even in prison he is dependent on others to “support and intercede on his behalf,” J.A. 313. There was also evidence that Walker relies on others for help in seeking medical attention.
Finally, Walker pointed to evidence of his lack of direction and inability to deal with unstructured time. He claimed that he lacks interest in any activities, other than watching television. During interviews with his experts, Walker could not state who the President of the United States was, had not heard of Hurricane Katrina (which had just recently occurred), and misstated his age as 32 when he had in fact turned 33 two months prior.
The Commonwealth took a different tack with respect to Walker’s conceptual skills. While admitting that Walker possessed conceptual skills that are “below average,” the Commonwealth’s expert, Dr. Hagan, opined that these limitations “did not significantly impair his capacity to adapt to the requirements of life including transportation, use of communication technology, planning, scheming, dealing with reasonably foreseeable contingencies, self advocacy, self-protective mechanisms, and selective portrayal of facts and circumstances.” J.A. 977. In support of this assertion, the Commonwealth and Dr. Hagan pointed to several events that purport to showcase Walker’s conceptual skills.
In particular, the Commonwealth focused on Walker’s extensive criminal history as evidencing his conceptual abilities. The Commonwealth referenced a fraudulent scheme concocted by Walker, whereby he arranged to sell a vehicle to an individual, told the individual that some money was needed to correct problems with the title, and absconded with the money. Dr. Hagan opined:
This conduct clearly demonstrates Mr. Walker’s capacity to develop a plan, consider various contingencies in connection with that plan, promote the plan to an unsuspecting person, and pull off the ruse by affecting [sic] his departure without being detected at least for the time being. He not only had to put the plan together, but also had to fool his victim into going along with the plan without arousing suspicion. This reflects considerable conceptual capabilities.
J.A. 978.
Dr. Hagan also considered how Walker reacted when he was being investigated for an armed robbery and drew the following conclusions:
Mr. Walker gave a statement to law enforcement on 3/2/93 (age 20) in connection with the Virginia Beach Armed Robbery charge. Mr. Walker had sufficient conceptual grasp of his situation *325 to deny any involvement in or knowledge of the offense. This was designed to protect his liberty interest. After [a law enforcement official] advised Mr. Walker of additional information provided by a witness, Mr. Walker then made an adjustment in his story to deal with this contingency. This reflects a degree of executive functioning and conceptual reasoning in that Mr. Walker had entered the interview with one strategy in mind and then changed that strategy based on immediately unfolding circumstances. He then gave a written statement which, although marked by misspelling and grammatical error, reflected a linear thought process with no oddities or illogical reasoning. The statement, which if believed, would have furthered his liberty interest.
J.A. 985. The Commonwealth also introduced court transcripts that contain examples of Walker testifying as to historical events and even correcting prosecutors as to the timeline of his various arrests.
In addition, the Commonwealth presented evidence of Walker’s ability to read and write. For example, the Commonwealth provided several examples of Walker’s writing ability, including prison forms and the written statement that he prepared in connection with an armed robbery charge. Dr. Hagan noted Walker’s admission that he would use a fellow inmate to write letters, not because “I cannot find the words,” but because “it’s easier for him to do it.” J.A. 979. Thus, according to Dr. Hagan, Walker’s reason for having others write letters for him was less a matter of inability and more a matter of convenience.
(2)
In attempting to prove significant limitations in his social skills, Walker presented evidence that he is a loner who has always had difficulties maintaining appropriate relationships with his peers. In particular, Walker presented school records replete with observations of his social and behavioral difficulties. His records describe his behavior variously as “aberrant,” “inappropriate,” “disruptive,” and “deviant.” J.A. 607, 609, 613, 1073. One report from Walker’s school years notes that he would “threaten[] smaller children and tease[] other students cruelly.” J.A. 607. Walker also presented evidence that this anti-social behavior continues to this day, in the form of affidavits from fellow inmates that he will flood his cell when he gets upset.
However, the Commonwealth presented its own evidence suggesting that Walker’s deficits in social skills are not significant. First, although Walker’s school records generally indicate his difficulties getting along with peers at school, other records from the same time period suggest that he was capable of developing and maintaining social relationships outside of the classroom. For example, his mother’s responses to a 1987 Virginia Department of Education Social Behavior Checklist indicate that Walker had “plenty of friends” and got along well with adults. J.A. 1064. Among his favorite activities, his mother listed “sports, church activities and talking to adults.” J.A. 1067. Moreover, a 1983 psychiatric evaluation noted:
There is no history of school avoidance or separation difficulties. Patient states that in classroom he is made fun of and called “retarded” by his classmates. He states that they get jealous when he makes 100’s and they get C’s and D’s on their tests. He states that they will not let him play any games with them and so then goes to play with the sixth graders. He and his mother both report that he is able to get along with neighborhood children without problems. He and his mother both report that he is the “class-clown” and this may bring *326 some attention to him in addition to his hyperactive type behavior in the classroom and might set him up to be the scape-goat.
J.A. 1076-77. Further, some of Walker’s school records indicate his ability to maintain appropriate social intercourse. Classroom reviews from 1987 note his “very appropriate classroom behavior” and his ability to “get[] along with his peers.” J.A. 1097.
Additionally, Dr. Hagan pointed to reports from prison officials of Walker’s behavior as indicative of social skills. Prison officials reported that Walker never had difficulty communicating his needs and interests and was cordial and conversational. Prison mental health services screenings of Walker note that he was clean, cooperative, and capable of engaging in “extensive conversations about family [and] security complaints.” J.A. 1435. His behavior during these screenings was variously described as “polite” and “cooperative.” J.A. 1435, 1438, 1441, 1444. Moreover, Dr. Hagan noted Walker’s ability to ingratiate himself to women and establish intimate relationships with them in a relatively short period of time as evidence of his social skills.
(3)
Walker presented evidence suggesting that he suffers from limitations in his practical adaptive skills. For example, he pointed to evidence that he is incapable of performing the basic tasks incidental to an independent life, such as renting an apartment, managing money, and paying bills. His mother’s affidavit portrays him as a man who “just wouldn’t have been able to read and understand a bill or a lease,” J.A. 156, and his brother averred that Walker “never knew how to handle money,” J.A. 159. The Commonwealth’s expert agreed that there is no evidence that Walker ever had a bill in his name.
Walker also introduced evidence that he was unable to obtain a driver’s license and was wholly dependent on others for transportation. His brother averred that Walker “never had a driver’s license. I never saw him take a public bus. If Darick wanted to get somewhere, me or another relative would have to drive him.” J.A. 159. Another relative stated that Walker “had a tough time understanding easy directions. I used to work straight down the street from my apartment. I told Darick exactly how to get from one place to the other, but he couldn’t find his way home even though it was right down the street.” J.A. 864.
Finally, Walker put forth evidence that he has a very limited job history and was unable to maintain steady employment pri- or to his incarceration. According to one of his experts, Walker “did not have a regular job or even stable part-time employment.” J.A. 311. Walker’s expert considered these facts important because “[a] critical adaptive behavior domain for adults is employment and self-support.” J.A. 310.
On the other hand, the Commonwealth presented a considerable amount of evidence illustrating Walker’s practical skills. For example, the Commonwealth presented Walker’s own testimony from his 1998 trial for armed robbery. That testimony included the following exchanges:
Q: And when you were stopped by Officer Hamilton, you were coming out of 3404 Howard Road?
A: Yes, I was, that’s my apartment number.
The Court: Mr. Walker, how did you get from Richmond down to Chesapeake? *327 Witness Derrick [sic] Walker: Well, sir, um, the person’s car that I had, I returned the car, and that person wanted to know why did I want a ride to the Tidewater area. I explained to that person what I had did. I just didn’t want to take the car and go to the Tidewater area and then have that person without a car, so she gave me a ride and dropped me off at my brother’s house.
J.A. at 1296, 1300. According to Dr. Hagan, these exchanges showcased Walker’s ability to remember addresses, his ability to make his way from one place to another, and his ability to drive. Dr. Hagan also pointed to records from Walker’s case file on his carnal knowledge conviction that relate instances of Walker driving a car, using a pager, and renting a hotel room.
In addition, Dr. Hagan testified as to his interviews with one of Walker’s girlfriends, Kelly Walker White. Ms. White related that Walker shared an apartment with her for a period of time, during which Walker babysat her son, cared for the apartment, and cooked from scratch. During the evidentiary hearing, Dr. Hagan gave the following testimony:
And it wasn’t just that he took on these tasks, he did them effectively, he did them repeatedly, he did them consistently. She would come home from work, the child was clean, was dressed, was powdered, bathed and not with a whimper of discontent from the child, and dinner was ready. And she was very pleased to have his able assistance.
J.A. 1876.
Moreover, Dr. Hagan noted that, with respect to Walker’s employment history, there was no evidence that Walker was ever discharged from employment due to an inability to perform the duties of the job. In his report, Dr. Hagan observed:
Although his experts declare that Mr. Walker was not able to secure and maintain a job, his own statement is that he found several jobs, but quit them at his own election, just as he quit Job Corps. He left because he did not have family support.... He said he left Long John Silver in Richmond after 7-8 months because he wanted-to go home and help his mother who had an unconfirmed heart condition. This was voluntary unemployment.
J.A. 1018. Dr. Hagan went on to explain that “[Walker’s] elected lifestyle, including chronic involvement in criminal activities, did not lend itself to mainstream employment, but there was no indication of an actual inability in that regard.” J.A. 1019— 20.
Finally, there is evidence in the record tending to show that Walker is able to adequately care for himself. For example, Walker washes his own clothing in prison in order to avoid skin irritation which he attributed to the soap used in the prison laundry. Dr. Hagan’s report also relied on statements from prison officials that they had never observed hygiene problems with regard to Walker and that Walker had never had any trouble communicating his needs and concerns to prison officials.
B.
Ultimately, four experts testified that Walker’s skills limitations are significant, basing their conclusions on school and medical records, clinical interviews, prior psychological evaluations, declarations from individuals familiar with Walker, and other records concerning his background, as well as the results of a standardized measure called the Adaptive Behavior Assessment System, second edition (“ABASII”). In contrast, the Commonwealth’s expert, Dr. Hagan, testified that Walker does not suffer from significant limitations in his adaptive behavior. He based his con *328 elusions on “[a] clinical interview with a collateral informant, review of interview summaries by trial defense investigators and mitigation specialist, in-person observation of Walker’s interviews with three psychologists on two occasions, numerous reports of psychological testing including IQ scores as well as [a] review of educational, correctional and vocational records.” J.A. 976. In his report, Dr. Hagan also concluded that Walker’s experts’ reliance on the ABAS-II to determine Walker’s adaptive behavior was not “sound practice.” J.A. 977.
Apparently crediting Dr. Hagan’s testimony over Walker’s experts’ testimony, the district court concluded that Walker failed to meet his burden of showing significant limitations in his adaptive behavior:
Petitioner has failed to show by a preponderance of the evidence that he has “significant limitations in adaptive behavior as expressed in conceptual, social, and practical adaptive skills.” See Va. Code Ann. § 19.2-264.3:1.1(A). While Petitioner has presented evidence that he suffers from below average mental intelligence, struggles to perform some basic activities, exhibits anti-social behavior, and obtains financial support from others, Petitioner has not shown by a preponderance of the evidence that he ■ has significant limitations in adaptive behavior. Petitioner has committed various crimes requiring the ability to relate to others, associated himself with women on a personal and intimate level, engaged in homemaking activities, seduced under-aged girls, used others to help him avoid authorities, independently invoked his Miranda rights, used his brother’s identity to obtain a driver’s license, and obtained goods for himself while in prison. Therefore, while [P]etitioner has below average mental intelligence and some limitations in adaptive behavior, the Court finds that Petitioner has not shown by a preponderance of the evidence that he is mentally retarded as defined by Virginia law.
J.A. 2370-71.[3]
In challenging these findings as being clearly erroneous, Walker argues that the district court’s holding “could only result from a complete failure to consider his overwhelming proof, appropriately weigh it, and make specific findings to explain the basis for its ruling.” Brief for Appellant Darick Demorris Walker, at 16. He further contends that the court’s “general findings ... lack evidentiary support and are consistent with the definition of mental retardation.” Id. We find no merit to these contentions.
As we have summarized above, the district court was presented with conflicting evidence concerning Walker’s adaptive skills, and it had the opportunity to assess the various witnesses who testified. Unfortunately for Walker, the court was not persuaded by his evidentiary presentation, and it concluded that he failed to meet his burden of proving the necessary fact that he suffers from significant limitations in adaptive behavior.[4] Although the court’s *329 finding in this regard may not be compelled by the evidence in the record, there is certainly evidence in the record to support it. Applying our limited standard of appellate review, we cannot conclude on the record presented that the court clearly erred. See Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 574, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) (“Where there are two permissible views of the evidence, the factfinder’s choice between them cannot be clearly erroneous.”); see e.g., Green, 515 F.3d at 301-03 (affirming district court’s finding that the petitioner failed to prove significant limitations in adaptive behavior under Virginia law notwithstanding conflicting evidence).[5]
Ill
Walker also claims that he was entitled to a jury determination of his mental retardation and that the district court erred by failing to empanel a jury. Although we previously rejected this claim in Walker II, he contends that our prior decision is erroneous based on what he perceives to be an intervening change in the law. We disagree.
Section 8.01-654.2 of the Virginia Code sets forth the framework for the resolution of Atkins claims filed by petitioners, like Walker, who were sentenced to death before April 29, 2003. It provides:
Notwithstanding any other provision of law, any person under sentence of death whose sentence became final in the circuit court before April 29, 2003, and who desires to have a claim of his mental retardation presented to the Supreme Court, shall do so by one of the following methods: (i) if the person has not commenced a direct appeal, he shall present his claim of mental retardation by assignment of error and in his brief in that appeal, or if his direct appeal is pending in the Supreme Court, he shall file a supplemental assignment of error and brief containing his claim of mental retardation, or (ii) if the person has not filed a petition for a writ of habeas corpus under subsection C of § 8.01-654, he shall present his claim of mental retardation in a petition for a writ of habeas corpus under such subsection, or if such a petition is pending in the Supreme Court, he shall file an amended petition containing his claim of mental retardation. A person proceeding under this section shall allege the factual basis for his claim of mental retardation. The Supreme Court shall consider a claim raised under this section and if it determines that the claim is not frivolous, it shall remand the claim to the circuit court for a determination of mental retardation; otherwise the Supreme Court shall dismiss the petition. The provisions of §§ 19.2-264.3:1.1 and 19.2- *330 264.3:1.2 shall govern a determination of mental retardation made pursuant to this section. If the claim is before the Supreme Court on direct appeal and is remanded to the circuit court and the case wherein the sentence of death was imposed was tried by a jury, the circuit court shall empanel a new jury for the sole purpose of making a determination of mental retardation.
If the person has completed both a direct appeal and a habeas corpus proceeding under subsection C of § 8.01-654, he shall not be entitled to file any further habeas petitions in the Supreme Court and his sole remedy shall lie in federal court.
Va.Code Ann. § 8.01-654.2.
We explained in Walker II that on its face “the Virginia statute does not provide for a jury for claims raised in federal court.” 399 F.3d at 324. We also held that § 19.2-264.3:1.1(C), which provides that “in any case in which the offense may be punishable by death and is tried before a jury, the issue of mental retardation ... shall be determined by the jury as part of the sentencing proceeding,” does not entitle Walker to a jury determination because that section’s reference to a jury determination is “in the context of the appropriate procedure at sentencing in state court.” Id. at 324-25.
Walker now argues that a subsequent Virginia case, Burns v. Warden of Sussex I State Prison, 269 Va. 351, 609 S.E.2d 608 (2005), constitutes an intervening change in the law that establishes his right to a jury. The issue in Bums was whether the jury provisions of § 19.2-264.3:1.1 apply to a determination of mental retardation when the Atkins claim is brought in a state habeas corpus proceeding. Specifically, in Bums the Commonwealth argued that § 8.01-654.2 only provides for a jury determination of an individual’s mental retardation claim when that claim is raised to the Virginia Supreme Court on direct appeal. 609 S.E.2d at 610. The Virginia Supreme Court rejected that argument, however, interpreting § 8.01-654.2 as requiring that the jury provisions of § 19.2-264.3:1.1 “apply whether the claim is raised in a direct appeal or as a habeas corpus petition.” 609 S.E.2d at 610.
Walker claims that Bums has somehow clarified that the jury provisions of § 19.2-264.3:1.1 are a substantive component of his rights under Atkins that must be applied to his case. We disagree. Bums squarely holds that the jury provisions of § 19.2-264.3:1.1 apply to mental retardation claims that proceed in state court, regardless of whether they are raised on direct review or in a state habeas proceeding. This is wholly consistent with the language of § 8.01-654.2, which expressly states that “[t]he provisions of §§ 19.2-264.3:1.1 and 19.2-264.3:1.2 shall govern a determination of mental retardation made pursuant to this section”-—-referencing claims brought in state court. Bums does not address the language that our panel found to be controlling when Walker originally raised this claim—specifically, the provision providing that: “If the person has completed both a direct appeal and a habeas corpus proceeding under subsection C of § 8.01-654, he shall not be entitled to file any further habeas petitions in the Supreme Court and his sole remedy shall lie in federal court.” § 8.01-654.2.
In short, Bums merely clarifies that the jury provisions of § 19.2-264.3:1.1 apply to all Atkins claims brought in a state court proceeding, both on direct review and state habeas review. This does not affect our prior determination that Walker is not entitled to a jury in this ease because he is in federal court. Accordingly, the district court did not err by refusing to empanel a *331 jury to determine Walker’s mental retardation claim.
IV
Based on the foregoing, we affirm the judgment of the district court.

AFFIRMED

. "While Walker’s claim ultimately derives from his rights under the Eighth Amendment, whether he is mentally retarded is governed by Virginia law.” Walker v. True, 399 F.3d 315, 319 (4th Cir.2005) (“Walker v. True II").

. These definitions come from the American Association of Mental Retardation's standards for measuring adaptive skills. See Green, 515 F.3d at 302.

. That the district court set forth these factual findings under the heading "Conclusions of Law" is immaterial to our review. See TriTron Int’l v. Velto, 525 F.2d 432, 435 (9th Cir.1975) ("The fact that the district court intermingled some of its findings of fact with its conclusions of law is of no significance. We look at a finding or a conclusion in its true light, regardless of the label that the district court may have placed on it.").

. To the extent that Walker challenges the adequacy of the district court's findings, we find no error. The district court listed the characteristics that it felt militate against finding that Walker met his burden. The court noted Walker's criminal history, his so *329 cial relationships, his practical skills, and his ability to navigate the prison environment, among other evidence, as supporting its judgment. Moreover, the court heard from competing experts, and its decision suggests that it credited the testimony of the Commonwealth's expert over those of Walker.

. We also are unpersuaded by Walker's contention that the judgment must be reversed because mentally retarded individuals are capable of exhibiting many of the skills that the district court relied on when it made its finding that he is not mentally retarded. As noted, Walker bore the burden of proving significant limitations in adaptive behavior, and he unsuccessfully attempted to meet that burden during the evidentiary hearing. As we view his argument, he now implicitly argues that the Commonwealth had some obligation to establish that he does not suffer from significant limitations in adaptive behavior. However, we rejected that view in Walker II. See 399 F.3d at 326 ("The state does not have a corollary duty to prove that a defendant is 'not retarded.... ’ ”).