**UNITED STATES of America,**

v.

**Ahmed Muse SALAD, Defendant.**

**Criminal No. 2:11cr34.**

United States District Court,
E.D. Virginia,
Norfolk Division.

July 15, 2013.

Benjamin L. Hatch, Brian J. Samuels, Joseph E. DePadilla, Assistant United States Attorneys, Norfolk, VA, for Plaintiff.

Larry M. Dash, Paul G. Gill, Office of the Federal Public Defender, Norfolk, VA, Claire G. Cardwell, Esquire, Richmond, VA, for Defendant.

## *OPINION*

REBECCA BEACH SMITH, Chief Judge.

This matter comes before the court on Defendant Ahmed Muse Salad's Motion to Bar Death Penalty Under Eighth Amendment and 18 U.S.C. § 3596(c) ("Motion"), filed on April 15, 2013. (ECF No. 608.) For the reasons stated herein, the court **FINDS** that Ahmed Muse Salad ("Salad" or the "Defendant") is not intellectually disabled [1] and, therefore, is eligible for the death penalty. Accordingly, the Defendant's Motion is **DENIED.**

1. The court uses the term "intellectual disability" rather than "mental retardation" throughout this Opinion; however, at the hearing and in filings the terms were used interchangeably. *See* American Association of Intellectual and Developmental Disabilities, *Intellectual Disability: Definition, Classification, and Systems of Supports* 3 (11th ed. 2010) ("AAIDD Manual"); *United States v. Northington,* No. 07–550–05, 2012 WL

868

## I. PROCEDURAL HISTORY

On February 1, 2013, Salad filed a Notice of *Atkins* Filing,[2] in accordance with the agreed Order Regarding Mental Health Evidence, entered September 18, 2012. (ECF Nos. 508, 562.) Briefing and exchange of expert reports proceeded in accordance with the court's agreed Order Regarding *Atkins* Procedures ("*Atkins* Procedures Order"), entered February 22, 2013. (ECF No. 570.) Following the Defendant's Motion, filed April 15, 2013, the United States filed a Response in Opposition ("Response"), on April 22, 2013. (ECF Nos. 608, 614.) The Defendant filed a Reply ("Reply") on April 26, 2013. (ECF No. 618.) The court subsequently held an evidentiary hearing on the Motion, which began on May 7, 2013, and concluded on May 10, 2013. The parties then filed supplemental briefs, including proposed orders, on May 20, 2013, followed by replies on May 24, 2013. (ECF Nos. 652, 653, 673, 674.)[3] The Motion is now ripe for review.

## II. LEGAL STANDARDS

The Federal Death Penalty Act ("FDPA") prohibits execution of intellectually disabled defendants. *See* 18 U.S.C. § 3596(c). The United States Supreme Court, in *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), later articulated the constitutional dimension to this prohibition, holding that execution of intellectually disabled defendants violates the Eighth Amendment's prohibition on "cruel and unusual punishments." *Id.* at 311, 122 S.Ct. 2242. Both *Atkins*

and the FDPA, however, are silent on matters of procedure and substance; they provide neither the protocols for conducting an inquiry into intellectual disability, nor a substantive, bright-line test. Thus, the legal principles in federal death penalty cases have developed, in common-law fashion, in various district courts.

■ As a threshold matter, both parties agree, and the vast majority of courts to address this issue have found, that the defendant bears the burden of proof on an *Atkins* claim by a preponderance of the evidence. *See, e.g., Hooks v. Workman,* 689 F.3d 1148, 1166 (10th Cir.2012); *United States v. Wilson,* 922 F.Supp.2d 334, 342–43 (E.D.N.Y.2013) (collecting and citing numerous federal cases holding same). Additionally, the finding of intellectual disability is a legal conclusion, but the underlying findings are factual issues. *See Walker v. Kelly,* 593 F.3d 319, 322–23 (4th Cir.2010) (construing Virginia law).

■ The substantive standards for determining intellectual disability are grounded in the "clinical definitions of mental retardation." *Atkins,* 536 U.S. at 318, 122 S.Ct. 2242. The clinical definitions, however, are not "constitutional command[s]." *United States v. Candelario–Santana,* 916 F.Supp.2d 191, 194–95 (D.P.R.2013) (citing *Hooks,* 689 F.3d at 1172). The clinical standards for measuring intellectual disability are derived from two primary sources: the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision ("DSM–IV–TR"),[4] and the Manual of the American

2873360, *2, 2012 U.S. Dist. LEXIS 97481, at *9 n. 6 (E.D.Pa. July 12, 2012).

2. *See Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).

3. Hereinafter, the court refers to the first round of supplemental briefs filed after the

hearing as "Def. Supp. Mem." and "Gov't Supp. Mem." The replies are referred to as "Def. Supp. Reply" and "Gov't Supp. Reply."

4. Between the hearing and the date of this Opinion, the American Psychiatric Association ("APA") released the newest (fifth) version of the Diagnostic and Statistical Manual

Association of Intellectual and Developmental Disabilities, Eleventh Edition ("AAIDD Manual").[5] Both sources prescribe a three-pronged test for a diagnosis of disability: (1) significantly subaverage intellectual functioning, usually defined as an IQ of about 70 or below; (2) significant impairments in adaptive skills, such as communication, self-care, and self-direction; *and* (3) manifestation of those deficits before the age of eighteen. All three elements are essential to a finding that an individual is intellectually disabled. *See* AAIDD Manual at 7; DSM–IV–TR at 41, 49; *Wilson,* 922 F.Supp.2d at 341–42.

■ Additionally, "[t]hough the factors state that the problems had to have manifested themselves before the defendant reached the age of eighteen, it is 'implicit' that the problems also [must have] existed at the time of the crime." *Holladay v. Allen,* 555 F.3d 1346, 1353 (11th Cir.2009) (citing *Smith v. State,* No. 1060427, —— So.3d ——, ——, 2007 WL 1519869, at *8 (Ala. May 25, 2007)); *see also United States v. Hardy,* 762 F.Supp.2d 849, 881 (E.D.La.2010) (holding that the court must determine whether the defendant was intellectually disabled "at the time of the crime"). Thus, to assess the Defendant's claim of intellectual disability, the court must evaluate evidence of intellectual functioning and adaptive skills, both before and after age eighteen. *See id.; see also Wilson,* 922 F.Supp.2d at 342–43.

## III. THE DEFENDANT'S BACKGROUND [6]

The characteristics and national origin of the Defendant present a number of unique challenges in evaluating his *Atkins* claim. As such, the court provides a brief overview of his background in advance of applying the three-pronged intellectual disability test to the Defendant. Salad is an approximately twenty-seven to twenty-nine year old Somali male.[7] He was born into a large nomadic family[8] in the bush region outside the small city of Qardho in Puntland, a semiautonomous region in northeastern Somalia. Salad is one of ten children, and his mother died when he was approximately six years old. A nomadic existence in this arid region of Somalia consists of frequent relocation based on weather patterns and the availability of water, and subsistence through the raising of livestock, namely goats and camels.

As a young boy, Salad received no formal schooling. Starting around the age of five, he, like most nomadic Somali boys, assisted in the care of livestock, such as herding and milking the goats. At the age of approximately eleven or twelve, Salad left his family in the bush region, and traveled to the city of Qardho, where he lived for approximately three or four years with an aunt. While in Qardho, Salad attended *madrassa,* or Quranic school, where pupils study and memorize Quranic

---

of Mental Disorders, the DSM–V. At the time of the briefing and examination, the DSM–IV–TR remained the most updated version of the DSM.

5. The AAIDD was known formerly as the American Association on Mental Retardation, or "AAMR."

6. Neither party disputes the general facts included in this summary. *See* Mot. (ECF No. 608); Resp. (ECF No. 614); Reply (ECF No. 618); Def. Supp. Mem. (ECF No. 653); Gov't Supp. Mem. (ECF No. 652).

7. The Defendant's exact age is unknown as he has no birth certificate. His birth was reportedly during a severe drought in the region in which he was born in approximately 1986. All parties agree that the Defendant is at least twenty-seven years old.

8. A Somali family is part of a larger historic clan, which can be traced back for generations.

verses. It is unclear exactly how many years Salad attended *madrassa*.

At approximately age fifteen, he joined the Puntland militia, known as the Darawish. As a soldier, Salad learned the basics of how to use an AK–47 firearm and was primarily a guard at military installments, although he was also involved in a number of skirmishes. He did not receive any specialized military training while in the Darawish. At some point he became a member of the Presidential Guard for the President of Puntland, and later, as a member of the Darawish forces, a police officer in Qardho. During the years Salad was in the militia, and possibly afterwards, he attempted to make extra money fishing on the Somali coast with other members of his clan. Salad eventually left the militia and became a member of the group that hijacked the *Quest* in February 2011. He has been imprisoned in the United States since March 2011.

Salad's brother was murdered approximately six years ago. Thereafter, Salad married his brother's widow, Bisharo, also known as Zahra. He assumed responsibility for Bisharo and his brother's three children, and he and Bisharo had one child together in approximately 2010. It is unclear if, at present, Salad is still married to Bisharo.

Given the Defendant's nation of origin and his upbringing, there are no formal records of any kind—educational, medical, employment, or otherwise—in this case. Additionally, Salad does not speak or read English; thus, the vast majority of the evidence before the court, including the intelligence quotient ("IQ") testing, was obtained through use of interpreters. Moreover, as recognized by both parties and the court at the *Atkins* hearing, there are *no* formal tools, to assess either intellectual functioning or adaptive skills, normed to evaluate a nomadic Somali man of the Defendant's age, or a Somali of any

age for that matter. With this background in mind, the court addresses each of the three prongs of intellectual disability in turn.

## IV.  PRONG ONE: INTELLECTUAL FUNCTIONING

■ As noted above, the court is guided in its substantive analysis by the clinical standards for intellectual disability. *See Atkins*, 536 U.S. at 318, 122 S.Ct. 2242. Although those standards do not represent "a constitutional command," *Hooks v. Workman*, 689 F.3d 1148, 1172 (10th Cir. 2012), the court frames its analysis of the evidence in terms of those clinical standards. To prevail on the first prong of an intellectual disability claim, a defendant must prove, by a preponderance of the evidence, that he displays "significantly subaverage intellectual functioning," generally measured by IQ scores. *See, e.g., Wilson*, 922 F.Supp.2d at 343.

### A.  Definitional Standards

Assessing intelligence, even with the aid of standardized instruments, is an inexact science. *See* AAIDD Manual at 31. Nevertheless, IQ tests are the best available tools for measuring intellectual functioning. *Id.* Accordingly, both the AAIDD and the APA frame prong one criteria in terms of IQ scores. *See id.* ("The 'significant limitations in intellectual functioning' criterion for a diagnosis of intellectual disability is an IQ score that is approximately two standard deviations below the mean, considering the standard error of measurement for the specific instruments and the instruments' strengths and limitations."); DSM–IV–TR at 41 ("Significantly subaverage intellectual functioning is defined as an IQ of about 70 or below (approximately 2 standard deviations below the mean).").

■ As the definitions indicate, analysis of prong one cannot proceed by simply

comparing numerical scores. Both clinical sources instruct analysts to consider the circumstances that might affect a subject's final score. *See* DSM–IV–TR at 42 ("The choice of testing instruments and interpretation of results should take into account factors that may limit test performance[.]"); AAIDD Manual at 35, 85 (emphasizing the importance of "clinical judgment" in applying tests and interpreting scores). In the *Atkins* context, the court must examine the reliability and validity of IQ scores, and consider the credibility of witnesses that proffer expert opinions on those scores. *See Thomas v. Allen*, 614 F.Supp.2d 1257, 1264 n. 16 (N.D.Ala.2009) (describing "reliability" as the ability of a testing instrument to yield consistent results, and "validity" as its ability to accurately measure the target characteristic); *see also United States v. Nelson*, 419 F.Supp.2d 891, 903 (E.D.La.2006) (noting the importance of credibility determinations).

### B. Statistical Principles

Because the evidence in this case consists of varying interpretations of widely divergent IQ scores, the court briefly reviews the relevant statistical principles and their effects on the legal analysis. As the definitions indicate, IQ is measured by standardized instruments, and assessed relative to the mean of a representative population. A standardized test is one that was "administered to a large, representative sample of the population in order to predict the distribution of results that the general population would likely obtain." *Wilson*, 922 F.Supp.2d at 344. Properly normed IQ test instruments are normalized and scaled to a mean of 100.

Intellectual disability is measured in terms of standard deviations from the mean. The standard deviation, which measures "the dispersion of scores in a distribution," is 15 points. AAIDD Manual at 224. Two standard deviations from the mean, the working definition of a significant deficit in intellectual functioning, equates to an IQ score of approximately 70. *Id.* at 31, 39; DSM–IV–TR at 41. As noted above, the parties agree that no IQ test has been properly normed for administration to a Somali nomad like the Defendant. In addition, language barriers prevented the application of the verbal component of several full-scale IQ tests, so the testing in this case was confined to non-verbal measures of IQ.

■ Apart from the concerns about the normative sample, the court must also consider the standard error of measurement ("SEM") inherent in any test administration, even those tests which have been properly normed by reference to a representative sample population. The SEM is expressed as a "plus-or-minus" point spread around the reported score, and it is used to calculate the confidence interval of the result: "[t]he statistical interval, or range, within which the person's true score falls." AAIDD Manual at 218.[9] Although the testimony in this case referred at times to the 95% interval, the court need not, and should not, necessarily adopt that standard. With an increase in confidence comes a decrease in precision. As discussed extensively in *United States v. Wilson*, 922 F.Supp.2d 334 (E.D.N.Y.2013), the considerable weight of case law on this issue, and the "overwhelming practice" in the clinical settings, is to use a range of

---

9. For example, given a score of 73 on a test with a SEM of 3 points, such as the Test of Nonverbal Intelligence, Fourth Edition ("TONI–4"), one can say with 67% confidence that the true score falls between 70 and 76 (one SEM above and below the score), and with 95% confidence that the true score falls between 67 and 79 (two SEMs above and below the score). *See* AAIDD Manual at 36.

one SEM above and below the observed scores:

> [T]he application of a 95% confidence interval would permit diagnoses of mental retardation well above what has previously been considered the approximate upper bound for a finding of subaverage intellectual functioning.... If the court were to apply a 95% confidence interval to an IQ test with an SEM of 5, then a person could conceivably be diagnosed with mental retardation if his observed IQ score were 80—i.e., two SEMs above 70. So far as the court is aware, no court or clinician has made a finding of mental retardation based on such a high IQ score, and neither the AAIDD nor the APA has ever suggested that such an IQ score would be an indication of significantly subaverage intellectual functioning.... [T]he court considers the use of a 95% confidence interval to be particularly inappropriate in the context of an *Atkins* claim [because] the law places the burden on the defendant to prove his mental retardation by a preponderance of the evidence.

*Id.* at 347–48. As discussed further *infra* at Part IV.D., the court finds no reason to relax the standard so substantially as to allow the Defendant to carry his burden by proffering a figure that might be two SEMs below the true score. *See id.*[10]

Additionally, the court should be cognizant of the "practice effect." This phenomenon describes the likelihood of inflated scores on re-administrations of similar IQ tests within a short period of time.

*See, e.g.,* AAIDD Manual at 38; *see also United States v. Nelson,* 419 F.Supp.2d 891, 898 (E.D.La.2006). The higher scores on the second test might reflect a subject's familiarity with the testing instrument, not necessarily his or her true ability. As discussed *infra* at Part IV. D, neither party advocated application of the practice effect in evaluating the Defendant's scores, and the court does not deem its consideration appropriate here. With these statistical and legal principles in mind, the court next examines the record of testing and the evidence adduced at the hearing.

### C. Testing History and Evidence

The first round of IQ testing was administered by Dr. Mark Schuler, a licensed psychologist based in St. Louis Park, Minnesota. *See* Mot. Continue Att. 2 at 4 (ECF No. 589). This testing predated the Defendant's *Atkins* notice and, in fact, likely precipitated it. *See id.* ("After additional conversations between defense team and both [Dr. Schuler] and the [second psychologist] who saw [Salad] in November, the team looks further into [intellectual disability] issues, with specific emphasis on *Atkins* 'prong one' issue of significant cognitive deficit as measured by IQ test."). Dr. Schuler interviewed the Defendant on or about August 27 and 28, 2012. *See id.* He administered two tests: the Test of Nonverbal Intelligence, Fourth Edition ("TONI–4"), and the Test of Nonverbal Intelligence, Third Edition ("TONI–3"). Dr. Schuler reported in October of 2012 that the Defendant scored 76 and 68, respectively. *Id.* The court re-

---

**10.** After adjusting for the SEM, courts must also consider whether to account for the "Flynn Effect." *See Walker v. True,* 399 F.3d 315, 322–23 (4th Cir.2005). The Flynn Effect describes a documented increase in IQ levels over time. As a result, IQ tests must be periodically re-normed to account for the population becoming more intelligent; a score on an outdated test might overstate IQ relative to the contemporary population. The parties do not discuss the Flynn Effect in detail, because the phenomenon was based on studies only in industrialized countries. Because the Fourth Circuit does not necessarily instruct courts to apply an adjustment to account for the Flynn Effect, and because any such adjustments at this juncture would require unsubstantiated speculation, the court declines to apply any Flynn adjustments to the scores in this. case.

ceived no testimony about the statistical data pertaining to the TONI–3, nor details about the contents of the tests or the order in which Dr. Schuler administered them. Dr. Schuler did not testify at the hearing, but his score reports provided reference points for experts retained by both parties.

The Defendant was next examined by Evan Nelson, Ph.D., a forensic psychologist retained by the defense team. *See* Mot. at 4.[11] Dr. Nelson administered three tests to the Defendant on January 24, 2013: the TONI–4 (using a different form ("Form A") than the test Dr. Schuler administered ("Form B")); the Performance Subtests of the Wechsler Abbreviated Scale of Intelligence ("WASI"); and the Nonverbal Scale of the Stanford–Binet Intelligence Scales, Fifth Edition ("SB–V").

The Defendant scored a 75 on the TONI–4, which Dr. Nelson characterized as statistically indistinguishable from the 76 Salad obtained on the TONI–4 Dr. Schuler administered. On the WASI, the Defendant's scores on two sub-scales ("Block Design" and "Matrix Reasoning") yielded a Performance IQ of 63. Finally, on the SB–V, the Defendant scored a Nonverbal IQ of 48. The Nonverbal Scale of the SB–V comprises five subtests: "Fluid Reasoning," "Knowledge," "Quantitative Reasoning," "Visual Spatial," and "Working Memory." The Defendant scored comparatively well on the Quantitative Reasoning and Working Memory subtests. In

his report, Dr. Nelson also acknowledged three instances of possible cultural bias in questions in the "Knowledge" subtest but noted that, even accounting for those points, the Defendant's score would rise only to 51.

The United States retained Paul Montalbano, Ph.D.,[12] to examine the Defendant. Dr. Montalbano's report and testimony were extensive and thorough, because he qualified without objection as an expert to opine on both prongs one and two of the intellectual disability analysis. Relevant to prong one, Dr. Montalbano planned to administer the Comprehensive Test of Nonverbal Intelligence, Second Edition ("CTONI–2"). Like the TONI–3 and TONI–4 tests administered by Drs. Nelson and Schuler, the CTONI–2 is a valuable instrument "for testing individuals, who are non-English speaking or individuals for whom verbal testing might be inappropriate." Montalbano Report at 15, Gov't Ex. A. Although analysis of the CTONI–2 involves the same difficulties as the other intelligence tests normed for the United States population, Dr. Montalbano acknowledged that the test results, whether high or low, could provide valuable information on prong one in this unusual case. *Id.* ("Therefore, while potentially being an instrument useful in obtaining data on intellectual functioning, it would be difficult to interpret the results. Nevertheless, if Mr. Salad obtained a high enough score it would tend to argue against intellectual disability.").

---

11. Dr. Nelson earned a Ph.D. in clinical psychology from the University of North Carolina at Chapel Hill in 1991. He completed postdoctoral residency at Central State Hospital in Petersburg, Virginia, in 1992. Since 1995, he has been a partner in the firm of Forensic Psychology Associates, P.C., based in Midlothian, Virginia. Dr. Nelson testified at the hearing on May 7, 2013.

12. Dr. Montalbano earned a Ph.D. in Clinical Psychology from Adelphi University in 1990.

He is currently the Deputy Chief for Forensic Psychology Services and Postdoctoral Fellowship in Forensic Psychology at the Walter Reed National Military Medical Center in Bethesda, Maryland. Dr. Montalbano examined the Defendant on March 15, 2013. Pursuant to the *Atkins* Procedures Order (ECF No. 570), that interview was videotaped. Dr. Montalbano filed a report on April 1, 2013, and testified at the hearing on May 9, 2013.

Despite his planning, Dr. Montalbano was unable to administer the CTONI–2. In order to gauge the Defendant's response style, and thereby determine whether the Defendant's responses on a test like the CTONI–2 are likely the result of malingering or feigning weakness, Dr. Montalbano decided to administer a threshold test: the Test of Memory Malingering ("TOMM").[13] Although Dr. Montalbano engaged the services of an interpreter to assist with administering the test, the Defendant indicated that he did not understand the test instructions. The Defendant failed to complete even the two sample questions, at which point Dr. Montalbano, in accordance with the TOMM protocols, discontinued the testing. The Defendant demonstrated similar difficulty with the instructions for the CTONI–2, again despite Dr. Montalbano's concerted efforts to explain the procedures to the interpreter. *See* Montalbano Report at 15–16, Gov't Ex. A. Accordingly, Dr. Montalbano decided against administering the CTONI–2.

### D. Analysis

The foregoing evidence offers, at best, an inconsistent picture of the Defendant's intellectual functioning, even though the Defendant adduced all of the scores at issue. On one hand, the Defendant offers scores from the nonverbal portions of the WASI and SB–V that fall substantially below the general threshold for intellectual disability, even after accounting for the standard error of measurement. On the other hand, the Defendant presents scores on various versions of the TONI that are consistently above that threshold, including two scores of 75 and 76 on the TONI–4. From this evidence, Dr. Nelson concluded that Salad "probably" has significant limitations in intellectual functioning, and that he "probably" had them before the age of eighteen as well. *See* Hr'g Test. of Dr. Nelson (May 7, 2013); Def. Supp. Mem. Att. 1 ¶ 51.[14]

The Defendant places great weight on the absence of separate testing by Dr. Montalbano. *See, e.g.*, Def. Supp. Mem. at 2. Such reliance is misplaced; the Defendant bears the burden of presenting evidence of intellectual disability. Although a larger sample of IQ scores might have been helpful to the court, as it would in most cases involving IQ, their absence is not a failure of proof by the United States, as the burden here rests with the Defendant. Moreover, Dr. Montalbano thoroughly explained his reasons for declining to administer any tests,[15] and provided co-

---

**13.** Dr. Montalbano also considered an alternative test, the nonverbal portion of the Validity Indicator Profile ("VIP"). Because of the Defendant's "perceived inability to grasp the instructions of the TOMM or CTONI–2," however, Dr. Montalbano declined to administer the VIP. Montalbano Report at 15, Gov't Ex. A.

**14.** Dr. Nelson *did not* opine to a reasonable degree of scientific certainty in his professional opinion as a clinical psychologist that Salad has significant limitations in intellectual functioning. Although the court acknowledges the burden of proof on an *Atkins* claim is a preponderance of the evidence, it is indicative of Dr. Nelson's confidence in his conclusion that he did not find with a reasonable

degree of scientific certainty, in his professional opinion, that Salad's intellectual functioning is significantly impaired. Rather his conclusions were stated as "probably," which he then defined during his hearing testimony as "more than likely." Hr'g Test. of Dr. Nelson (May 7, 2013).

The court notes that citations to filed hearing transcripts are used in this Opinion where available. Otherwise, the citations are only to the date of the individuals' hearing testimony and are based on the court's notes thereof. The court reserves the option to add transcript citations where appropriate, if and when available.

**15.** *See supra* Part IV.C, pp. 16–17. In fact, Dr. Montalbano's reluctance to continue test-

gent insight into scores obtained by Drs. Schuler and Nelson.

■ Both parties agree that clinical judgment is a critical factor in analyzing IQ scores, particularly in these circumstances, in which the test instruments are concededly poorly suited to the task. *See* Def. Supp. Mem. at 2; Gov't Supp. Mem. at 13. The court's role is not, at this juncture, to apply another level of clinical judgment or diagnosis. Instead, its role is to evaluate the evidence and testimony provided by the expert witnesses, and to determine whether the Defendant has carried his burden of demonstrating, in light of the foregoing standards, that he suffers from significantly subaverage intellectual functioning. The court finds that the Defendant has not carried that burden.

The court first addresses the relative persuasive value of each of the IQ tests administered to the Defendant. On this point, the evidence indicates that the variants of the TONI, however imperfect under the circumstances, provide the most reliable indicators of the Defendant's intellectual functioning.[16] The advantages stem in large part from the TONI's ability to generate an IQ score even in the face of cultural or linguistic challenges. The results of the TONI series may still present an incomplete picture of the subject's intelligence; as the name indicates, the tests focus on nonverbal skills. Nevertheless, the TONI was designed as a self-contained instrument to provide a reliable IQ score.

The scores obtained from the nonverbal portions of the WASI and Stanford–Binet,

by contrast, require more extrapolation. Dr. Nelson conceded on cross-examination that the nonverbal score, standing in isolation, might underestimate the subject's IQ. *See* Hr'g Test. of Dr. Nelson (May 7, 2013) (responding that incorporating the verbal IQ "could lead to a higher overall IQ"). Although Dr. Nelson testified that, by the same token, a low verbal score could cause a decrease in the overall IQ, subsequent inquiry by the United States suggests that, in the particular circumstances of this case, such an effect is unlikely. *Id.* Salad demonstrated relative strengths in the areas of verbal memory and verbal reasoning, as indicated both in Dr. Schuler's report and in Dr. Nelson's own administration of the SB–V subtests. The United States argues, and the court agrees, that such results are unsurprising in light of Somalia's oral tradition.[17] Dr. Nelson's testimony simply was not persuasive on the issue of the partial scores derived from the WASI and SB–V being as reliable as those the Defendant obtained on the TONI–4.

Having failed to establish the strength of the scores from the WASI and SB–V, Dr. Nelson's arguments for averaging all of the scores is likewise unpersuasive. *See* Nelson Report at 6, Mot. Att. 2. Dr. Nelson admitted that such a simplistic approach has no basis in clinical standards; he described it, instead, as "common clinical sense." Hr'g Test. of Dr. Nelson (May 7, 2013). The court respectfully disagrees, and finds nothing sensible about according

---

ing, when it was professionally unwarranted, bolsters his credibility.

16. Although, for various legitimate reasons, neither expert administered the CTONI–2, both Drs. Montalbano and Nelson agreed that it was the gold standard test. *See* Hr'g Test. of Dr. Montalbano, Tr. at 108–109 (May 9, 2013); Hr'g Test. of Dr. Nelson (May 7, 2013).

17. The Defendant offered testimony from Dr. Patricia Johnson, who lived and worked in Puntland for approximately twelve years, on the strong oral tradition of the Somali people, particularly in the nomadic bush culture. *See infra* Part V.B.

equal weight to scores of unequal reliability.

The Defendant's consistently higher scores of 75 and 76 on the TONI–4 constitute evidence *against* a finding of intellectual disability, and the Defendant failed adequately to explain how those scores overestimate his intellectual functioning.[18] On this issue, Dr. Nelson relied only on the low range of the 95% confidence interval around those scores. Regarding the score of 75 that he obtained, Dr. Nelson testified that the 95% confidence interval reaches from 69 to 81. Hr'g Test. of Dr. Nelson (May 7, 2013). Although Dr. Nelson conceded that the import of a confidence interval means that the true score is as likely to be 81 as it is to be 69, he limited his focus to the low end of that range. *Id.* He also provided no persuasive justification for applying the imprecise 95% confidence interval, which incorporates two SEMs, instead of the 67% confidence interval, which incorporates only one. *Compare id. with* Hr'g Test. of Dr. Montalbano, Tr. at 42–43 (May 9, 2013) (explaining the 67% confidence interval); *see also supra* Part IV.B.

These relatively high scores on the TONI–4 diminish the importance of the heated debate between the parties about the legal propriety of deriving an IQ score for Salad by reference to the United States population. *See* Resp. at 18–20; Reply at 8. The United States maintains that comparison of defendants like Salad to American [19] sample populations will lead too often to "false negatives": test results erroneously indicating intellectual disability and precluding eligibility for the federal death penalty. *See* Resp. at 19. The Defendant characterizes the United States' approach as "brutally simple," and argues that it would unfairly subject foreign-born defendants to capital punishment. *See* Reply at 8; Def. Supp. Reply at 6. To insist on foreign-normed IQ tests—which simply do not exist—in order to carry the burden on prong one would render those defendants categorically incapable of meeting that burden. *Id.* As applied to this case, the Defendant argues that an American defendant with similar scores would not be eligible for the death penalty. *See* Def. Supp. Reply at 6.

The Defendant's logic is sound, but only to a point. The most reliable test results in this case are those that were, in fact, scored against American norms: the TONI–3 and, more importantly, the two administrations of the TONI–4.[20] An American defendant who attained IQ scores of 75 and 76 would face a very heavy burden in making a successful *Atkins* claim. *See Wilson*, 922 F.Supp.2d at 348–49 ("But if a defendant's 66% confi-

---

**18.** Although the two forms of the TONI–4 were administered over a relatively short period of time, the Defendant presented no evidence that would attribute either the 75 or the 76 to the "practice effect." *See supra* Part IV.B.

**19.** American, in this context, refers to the population of the United States, and is used to avoid confusion with the United States as a party to this case.

**20.** Even if, as urged by the United States, the court were to engage in speculation about the Defendant's scores relative to a hypothetical Somali-normed test, the reasonable inference to draw would be that Salad's intelligence may be much higher than what the administered tests suggest. *See* Resp. at 20. This inference is supported by the fact that the American-normed test for Salad's age group, twenty-five to twenty-nine, contained *no* individuals that had less than an eighth grade education. Gov't Ex. Y; Hr'g Test. of Dr. Montalbano, Tr. at 39 (May 9, 2013). In light of the fact that Salad's scores were normed against a population that had at least some level of formal schooling, the strength and consistency of Salad's scores on the TONI–4 are remarkable. Fortunately, in this case, the court need not rely upon such speculation.

dence interval ranges from, say, 71.4 to 76.6 (the result of a score of 74 on that test), then we would be at least 66% confident that his true score is higher than two standard deviations below the mean, strongly suggesting that he is not retarded.").

The court understands the clinical challenges associated with applying and interpreting IQ tests in the context of a case such as this one. The court is also mindful of the serious legal and policy arguments raised by both parties, but the court need not resolve those issues today. The United States does not argue, and this court does not hold, that individuals like Salad can never succeed on prong one of an *Atkins* claim. The court simply holds that this Defendant failed to meet his burden of proving that he suffers from significantly subaverage intellectual functioning, based on the IQ testing administered and his results thereon.

### E. Synopsis

To summarize, the court concludes that Salad has not met his burden of proof with respect to prong one. Although no existing standardized test is ideally suited to measuring the Defendant's IQ, the most reliable measures are those obtained by Drs. Nelson and Schuler on the TONI–4: scores of 75 and 76, respectively. Even after accounting for one standard error of measurement to compute a confidence interval of 67%, those scores are not sup-

portive of a finding of intellectual disability.

### V. PRONG TWO: ADAPTIVE FUNCTIONING

Turning to the adaptive functioning prong, for the reasons addressed below, the Defendant fails to carry the burden of showing by a preponderance of the evidence that he has significant deficits in this area.[21]

### A. Definition and Assessment of Adaptive Functioning

"Adaptive functioning refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting." DSM–IV–TR at 42. The AAIDD Manual requires proof of significant limitation in one of the areas of "conceptual, social, and practical adaptive skills." AAIDD Manual at 1.[22] As Dr. Montalbano stated, finding that an individual is significantly deficient in adaptive functioning requires finding that he is two standard deviations below the mean in terms of his adaptive skills functioning. *See* Hr'g Test. of Dr. Montalbano, Tr. at 35 (May 9, 2013); *see also* AAIDD Manual at 10. It is helpful in conceptualizing this threshold to consider that the individual must exhibit greater deficits due to intel-

21. As noted above, a defendant's failure to prove any one prong results in a failure of the entire *Atkins* claim. *See* DSM–IV–TR at 49 (discussing prongs one and two as "[c]oncurrent" limitations). Given the complex and unique circumstances of this case, despite the court's finding with respect to prong one, the court will fully evaluate the arguments made on prong two. *See Walker v. Kelly*, 593 F.3d 319, 332 (4th Cir.2010) (Gregory, J. dissenting) (analyzing an *Atkins* claim presented during federal collateral review of a Virginia death penalty case and finding that analysis of

only one prong "comes perilously close to the substantive floor set in *Atkins* ").

22. The DSM–IV–TR diagnoses limited adaptive functioning if a subject demonstrates "deficits or impairments" in two of ten areas: "communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." DSM–IV–TR at 49. Drs. Patton, Montalbano, and Patterson agreed that the AAIDD Manual and the DSM–IV–TR require evaluation of the same substantive areas.

lectual disability than 97 percent of the relevant comparison group. *Id.*

▮ Prong two generally requires a more expansive investigation of a defendant's life history and skill levels than could be fully evaluated through use of a normed instrument. *See United States v. Davis,* 611 F.Supp.2d 472, 491 (D.Md.2009) (describing prong two analysis as "amorphous"). Thus, an evaluation of adaptive functioning "involves significantly more subjective clinical judgment." *United States v. Hardy,* 762 F.Supp.2d 849, 883 (E.D.La.2010); *see also* AAIDD Manual at 29 (defining "clinical judgment" as "a special type of judgment rooted in a high level of clinical expertise and experience ... to enhance the quality, validity, and precision of the clinician's decision").

The AAIDD Manual provides several important guidelines for ·analyzing adaptive behavior. First, the analysis is often retrospective, in that it examines past behavior for evidence of conformity or non-conformity to the baseline standards for the subject's age and background. AAIDD Manual at 46; *see also Hardy,* 762 F.Supp.2d at 881 (noting that, in the context of an *Atkins* claims, the analysis is always retrospective). Second, in the absence of standardized measurements, analysts should examine multiple sources of information for "convergence"; exercise "reasonable caution" in resolving conflicting reports; and avoid drawing conclusions from isolated performances. AAIDD Manual at 48. That is, an evaluation

should not rely primarily on an individual's self-report of his skill level, but rather should rely on information gathered from third parties who are "very familiar with the person and have known him/her for some time and have had the opportunity to observe the person function across community settings and times." *Id.* at 47. Third, the analysis should focus on average ability, not peak functioning. *Id.* (describing this broader focus as a "critical distinction" between prongs one and two). And finally, clinicians should be mindful that subjects with mild intellectual disability present a complex picture of strengths and weaknesses, and analysts should not evaluate a subject's performance based on inaccurate stereotypes of disabled individuals. *See id.* at 7 ("[L]imitations often coexist with strengths.").

**B. Strategy to Evaluate Salad's Adaptive Skills**

There exist no standardized instruments for measuring adaptive functioning that would be remotely applicable to Salad due to his unique background and upbringing. As such, the Defendant's adaptive skills expert, James Patton, Ed.D.,[23] sought to create a baseline of the adaptive skills typical of a similarly-situated Somali male. Patricia Johnson, Ph.D., who lived and worked in Puntland for approximately twelve years, assisted in formulating an understanding of the baseline skills relevant to a Somali man, raised in a nomadic bush region, with no formal schooling. *See* Def. Ex. 6N. This baseline[24] ambitiously attempts to establish norms for various

---

23. Dr. Patton is an author and professor with a post-graduate degree in education from the University of Virginia. He is, at present, an adjunct associate professor in the Department of Special Education at the University of Texas at Austin. His work focuses on the field of intellectual disability. He filed two reports, which the court refers to as "Patton Declaration," signed April 1, 2013, and "Patton Letter Report," signed April 10, 2013. Mot. Att. 3 and 4 (ECF No. 608). Dr. Patton testified at the hearing on May 8 and 9, 2013.

24. It is notable that this baseline was created with the input of only one individual with in-country experience, and that she had not formally studied nomadic Somalis or previously attempted to assess developmental milestones of relevance for an adaptive skills assessment. While Dr. Johnson proved highly knowledgeable regarding cultural and political aspects of Somali life, the court cannot ignore that it was her singular perspective that was brought to bear in creation of the baseline.

phases of Salad's life, *i.e.*, as a young boy in the bush with nomadic responsibilities, and while living in a city as an adolescent with relatives.

Together, Drs. Patton and Johnson crafted an extensive list of questions used by Bridget Prince, a principal investigator with One World Research, and Farah Hussein, a Somali investigator retained by One World Research, to interview some of Salad's family members, teachers, and friends in Somalia. *See* Def. Ex. 60. The interview reports generated by One World Research, along with Dr. Patton's interview of the Defendant, form the foundation for his two declarations, and his testimony at the hearing that Salad is deficient in the conceptual and practical areas of adaptive functioning, and that those limitations existed before the age of eighteen.[25]

Both of the United States' experts addressed prong two. Dr. Montalbano's report analyzed the limited evidence before him regarding Salad's adaptive skills and concluded generally that he "did not believe the data reliably support a conclusion that [Salad] meets criteria for intellectual disability." Montalbano Report at 27, Gov't Ex. A. Raymond F. Patterson, M.D.,[26] the United States' expert who focused specifically on adaptive skills, sub-

mitted two reports dated April 1, 2013 ("Patterson Report I"), and April 10, 2013 ("Patterson Report II"). Gov't Exs. C and D. Dr. Patterson examined Salad for one hour and twenty minutes in March 2013, and reviewed many of the same documentary sources as Dr. Montalbano. Dr. Patterson opined, to a reasonable degree of medical certainty, that Salad does not demonstrate deficits in adaptive functioning due to intellectual disability. *See* Patterson Report I, at 20, Gov't Ex. C; Gov't Supp. Mem. at 13.

### i. Interview Reports

As a threshold matter, the court has serious reservations regarding the reliability of the Somalia in-country and Somali co-defendant interview reports, Def. Ex. 6P, which are the key pieces of evidence upon which Dr. Patton's opinion relies.[27] The reports warrant additional explanation and discussion regarding the mechanics of their preparation and attendant issues of reliability and credibility because they provide the foundation for Dr. Patton's opinion.

Farah Hussein, the in-country investigator found by Ms. Prince, conducted interviews of fourteen individuals in Somalia, utilizing a lengthy list of questions prepared by Dr. Patton. *See* Def. Supp.

**25.** Dr. Patton states in both declarations that he has "reason to believe" Salad is deficient in those two areas; however, at the hearing, he testified that, due to analysis of additional information in updated interview reports received after the date of his declarations, he does, in fact, believe Salad is deficient in the conceptual and practical areas of adaptive functioning. The court allowed Dr. Patton's revised opinion into evidence, but the reliability of the updated interview reports is quite questionable. *See infra* Part V.B.i.

**26.** Dr. Patterson is a highly qualified board-certified forensic psychiatrist with over twenty years of experience in clinical and forensic psychiatry. He received a doctor of medicine degree from Howard University College of

Medicine, and completed his psychiatric residency at Howard University and St. Elizabeth's Hospital, both in Washington, D.C. He is currently in private practice in Washington, D.C., and has been since 1981. He is an associate professor of psychiatry at both Georgetown University and Howard University College of Medicine. Dr. Patterson testified at the hearing on May 10, 2013.

**27.** At the hearing, the court admitted the interview reports into evidence over strong objection from the United States. Despite the inherent multiple levels of hearsay, the court deemed their consideration appropriate, but deemed they would be afforded proper weight given the reliability of the information therein.

Mem. Att. 1 ¶¶ 98–100. These interviews were conducted in the Somali language,[28] and were not simultaneously video or tape recorded in any manner. Mr. Hussein presumably made simultaneous handwritten interview notes in Somali, as Ms. Prince testified that he typed his notes in English at a later time following the interviews. He then emailed the English-typed notes to Ms. Prince. Ms. Prince testified that she subsequently "slightly" revised the interview notes to correct typographical and grammatical errors, before passing them along to the defense counsel and Dr. Patton.[29] She did not, however, have Mr. Hussein review the final version of the reports, nor did Mr. Hussein confirm with interviewees that the content of the reports reflected an accurate summary of their relationship to the Defendant or their understanding of Salad's abilities. Additionally, neither Dr. Patton nor Ms. Prince was present, in person, telephonically, or via video conference, for any of the interviews conducted by Mr. Hussein. Moreover, no investigator, expert, or defense attorney, much less the United States or the court, had the opportunity to follow-up directly with any of the interviewees regarding statements contained in the interview reports.[30]

In addition to the in-country interview reports, Dr. Patton relied upon reports from three cooperating co-defendants, Messrs. Omar, Mohammed, and Ali, all of whom testified at the *Atkins* hearing. As discussed further *infra* at Part V.C.ii., the testimony of these witnesses underscore the court's reliability and credibility concerns regarding the interview reports from Mr. Hussein through Ms. Prince to defense counsel, because the testimony heard at the hearing conflicted, *in sometimes significant respects*, with, or otherwise undermined, statements introduced into evidence through the reports of the co-defendants.[31]

## C. Analysis of the Defendant's Adaptive Skills Claims

■ As noted above, Dr. Patton found significant deficits in the Defendant's conceptual and practical adaptive functioning before the age of eighteen. At a threshold level, it is unclear the extent to which Dr. Patton believes these pre-age eighteen deficits endure, and the defense provided scant evidence regarding Salad's post-age eighteen adaptive skills. Regardless, the court will now address the defense's primary claims regarding both of the areas in which Dr. Patton identified significant deficits.[32]

28. Although Mr. Hussein speaks English with some fluency, *see* Def. Ex. 4J, the interviews were conducted in the primary language of both Mr. Hussein and the interviewees. It is unclear if any of the interviewees speak English.

29. Mr. Hussein's original notes were not available for review by the court or counsel through a certified interpreter to compare with the English version admitted into evidence at the *Atkins* hearing. Nor were the original English notes Mr. Hussein sent to Ms. Prince available. Only Ms. Prince's "corrected" interview reports were available and introduced into evidence, over the objection of the United States. *See supra* note 27.

30. *See supra* note 29 and accompanying text.

31. The reports of the cooperating co-defendants' interviews were prepared by the Federal Public Defender's investigators, Linda McGrew (Ali) and Kevin Ridgley (Omar and Mohammed), who were present at the interviews and took notes. They then typed their notes and forwarded them to defense counsel, who in turn made some changes to the final reports submitted into evidence. Given those witnesses' availability, the court required their appearance at the hearing, in addition to the reports. *See infra* note 37 and accompanying text.

32. It is the opinion of Dr. Patton and the United States' experts that Salad is not significantly deficient in the social skills area, which *inter alia* includes interpersonal skills, social responsibility, self-esteem, and gullibili-

### i. Conceptual Adaptive Functioning

Dr. Patton relied upon statements in the interview reports to conclude that (1) Salad required additional supervision for the basic tasks of herding and finding sustenance for the family's goats and camels; (2) he failed to learn the songs and poetry typical in nomadic cultures; and (3) he struggled to learn and memorize the Quran at the *madrassa* in Qardho. Setting aside for a moment the court's grave concerns regarding the reliability of the information in the multiple-level hearsay interview reports, the court does not find this evidence sufficient to establish that Salad's adaptive skills functioning is significantly deficient in the conceptual area, which includes language, reading and writing, money and time/number concepts, and a range of skills related to self-direction. *See* Mot. Att. 3, Patton Letter Report at 2 (ECF No. 608). As an initial matter, it is unclear from Dr. Patton's declarations and his testimony on what foundation he could determine that Salad's functioning deviated so significantly from Somali community norms. *See* Gov't Supp. Mem. at 27. Although there are many references in the interview reports to the fact that Salad was "slow" or, for example, that he was not given as much responsibility as other nomadic boys his age, it is unclear to the court how Dr. Patton could determine from those statements, even if they are accurate, that Salad's conceptual adaptive skills fell short of all but approximately three percent of the Somali population. *See supra* Part V.A.; AAIDD Manual at 10. The court's larger concern, however, is with the conflicting, and at times completely contradictory, evidence in the interview reports, and Dr. Patton's lack of explanation of his treatment thereof. *See* AAIDD Manual at 48 ("Use reasonable

ty. *See* Def. Ex. 6Q; Montalbano Report at 17, Gov't Ex. A; Patterson Report I at 17,

caution when weighing qualitative information obtained from respondents, especially in the presence of conflicting information.").

Specifically, with respect to Salad's reported lack of independence and self-direction while living in the bush, Dr. Patton relied, in part, upon the interview report of Hawa Farah Shaacuur, the Defendant's step-grandmother who did not live with the family, but visited from time to time. *See* Patton Letter Report at 2; Def. Ex. 6P, "Second Interview of Hawa Farah Shaacuur" at 1. Ms. Shaacuur's report indicates that Salad, unlike other boys, was supervised while herding goats at a young age, and was given less responsibility in caring for the camels when he was older. Def. Ex. 6P, "Second Interview of Hawa Farah Shaacuur" at 1–2. The report also states multiple times that Salad was deeply affected by his mother's death when he was approximately six years old. *Id.* As Dr. Patterson indicated, this alternative explanation for Salad's shortcomings while in the bush may be just as logical an inference to draw as that his deficits were due to intellectual disability, especially given the defense's admission that it was an extreme hardship to not have a mother in a nomadic society. *See* Hr'g Test. of Dr. Johnson, Tr. at 74–76 (May 8, 2013).

Moreover, Salad's own sister stated that "[b]ecause Ahmed lost his mother when he was 6 years old he did not get opportunity [sic] to learn life skills, so he developed slowly." Def. Ex. 6P, "Second Interview of Hawa Muse Salad." Similarly, Salad's father stated:

> The mother is the base of the family, she is the one who teaches a child life skills . . . a child always feels weak when they don't have their mother around. My

Gov't Ex. C.

son did not learn the proper life skills because of this reason. Def. Ex. 6P, "Second Interview of Muse Salad Hasan." Thus, the court is perplexed as to Dr. Patton's confidence that the Defendant's alleged shortcomings at performing various nomadic duties are attributable to intellectual disabilities, rather than, as multiple interviewees, including the Defendant's father and sister, stated, the loss of his mother at a young age. *See* AAIDD Manual at 47 ("Parents are often the best respondents available because they have known the individual the longest and observed attainment of developmental milestones, maturation, and the achievement of adaptive skills.").[33]

This reservation similarly applies to Dr. Patton's conclusion that Salad's reported struggles at the *madrassa* in Qardho were due to intellectual disabilities, rather than, as Dr. Patterson opined, learning disabilities, trouble transitioning to life in the city, or the fact that he was ostracized and mocked by other students because he was from the bush region. This is especially true in light of the fact that, at the school, students were beaten if they failed to respond correctly. Salad was physically abused by his step-mother, prior to moving to Qardho. *See* Def. Ex. 6P, "Second Interview of Hawa Muse Salad" ("[Our step-mother] beat us and she yelled at us all the time. . . . [She] threw stones [at Salad] which hit his face just above the eyes. He was bleeding very

badly."). Thus, his challenges in the *madrassa* environment could be related to fear of further physical abuse, amongst other plausible explanations, including lack of motivation. *See* Def. Ex. 6P, "Second Interview of Sheikh Nuur" ("Ahmed did not like school, because he. missed a lot of classes and his aunt was always pushing him to come to the school."); *id.*, "Interview of Osman Bare Salad" ("[Ahmed] never liked [the Quran] and he started to skip school. He skipped school more than the other students."); *id.*, "Interview of Abdifatah Shiikh Nuur" ("[Ahmed] was hyper and a complainer . . . [he] skipped school many times."). Fundamentally, the court is circumspect of Dr. Patton's failure to examine alternative explanations for Salad's reported difficulties, and credits Dr. Patterson's caution in refraining from necessarily attributing such deficiencies to intellectual disability.

In sum, the court finds that the interview reports provided insufficient evidence to support Dr. Patton's opinion that Salad's conceptual adaptive skills functioning was "significantly deficient" as compared with the relevant Somali population pre-age eighteen.[34]

ii. **Practical Adaptive Functioning**

Practical adaptive functioning includes, *inter alia*, skills related to daily living, personal care, occupational skills, and safety. The shortcomings Dr. Patton identi-

---

33. Although Dr. Patton admitted upon inquiry by the court that such an explanation was indeed plausible, he maintained his opinion that such deficits are, in fact, due to intellectual disability. *See* Hr'g Test. of Dr. Patton (May 9, 2013).

34. As noted above, conceptual skills also include reading and writing abilities. Dr. Patton noted in his preliminary declaration that Salad "remains illiterate in any written language." Patton Declaration, Mot. Att. 3, ¶ 15. Although an interview report from the Defen-

dant's wife states Salad reads Somali books, *see* Gov't Ex. V, the court finds the video footage of Salad attempting to read during his evaluation with Dr. Montalbano compelling evidence that he is, in fact, illiterate in any language. However, this by no means indicates intellectual disability, as only an estimated thirty-eight percent of Somalis are literate. *See* Central Intelligence Agency World Factbook, Somalia, *available at* https://www.cia.gov/library/publications/the-worldfactbook/geos/so.html.

fied with respect to Salad's practical adaptive functioning overlap, to some extent, with the conceptual adaptive functioning limitations he noted. *See* Patton Letter Report at 1–3 (citing difficulty fulfilling nomadic duties pertaining to goats and camels for both areas). The additional key facts Dr. Patton relied upon in finding that Salad had significant practical functioning deficits, were, again, gleaned from at least third-hand hearsay in interview reports. These facts are that (1) Salad struggled to adapt to city life, as he did not know the price of goods and had trouble making purchases, and he had difficulty navigating Qardho alone; (2) "although he kept his hair tidy and clothes clean, he never washed;" (3) he struggled to learn to swim and fish; and (4) he once displayed risky behavior by inadvertently firing his AK–47 while in the militia. *Id.* at 3–4.

As with Dr. Patton's assessment of Salad's conceptual skills deficits, he did not indicate to the court on what foundation he could claim Salad's skills fell *significantly* short of the average Somalis, beyond the baseline he and Dr. Johnson generated.[35] The baseline itself was not, however, rooted in evaluation of a specific quantity of Somalis over a given time. Thus, though ambitious in its aim, it is of limited utility to evaluate how the Defendant compares to his peers. For instance, the court is at a loss for context to understand how atypical it is for a nomadic Somali adolescent to fail to understand the monetary cost of goods in a city, having lived his entire life to that point in a nomadic culture based on bartering of goods. Likewise, the court can attach no particular import to the fact that Salad may have struggled to navigate Qardho, which from his perspective was a large city.

Regarding the deficits in self-care Dr. Patton indicates support a finding of practical adaptive skills deficits, the evidence before the court is entirely contradictory as to whether any such deficits actually existed, and whether, if they did exist, their origin is related to intellectual disability or other life factors and experiences. Indeed, the very report Dr. Patton relied upon to state that the Defendant "did not develop well in terms of personal care" attributes this shortcoming to "the absence of his mother," and then goes on to state that, by age ten, Salad "started looking after himself better such as eating better, washing and telling us when he was sick." Def. Ex. 6P, "Second Interview of Hawa Farah Shaacuur" at 2; Patton Letter Report at 4. The fact that Salad improved in these areas in a few years after his mother's death, which is estimated to have occurred when he was age six, cuts against attaching any weight to the fact that he previously may have struggled with self-care at some earlier point before age ten.

Moreover, the statements upon which Dr. Patton relies were made by Salad's step-grandmother, who "did not live with the family, but . . . used to visit them some times." Def. Ex. 6P, "Second Interview of Hawa Farah Shaacuur" at 1. Salad's own sister stated that he "did not have any problem with his personal care. He did not have problems with eating, dressing or his safety." Def. Ex. 6P, "Second Interview of Hawa Muse Salad." His sister's statements are further corroborated by one of Salad's friends who reported that he "was clean." Def. Ex. 6P "Second Interview of Abdirisaq Said Bare (Madoobe Bakayle)." The court is dubious of the weight Dr. Patton apparently attributed to a single sentence in an interview report of an individual who seemed to have limited contact with Salad, especially in light of contradictory reports that may logically. be seen as more reliable, given the rela-

---

35. *See supra* note 24 and accompanying text.

tionship of the interviewees to the Defendant. Setting aside this latter issue, Salad's step-grandmother's report plainly does not support the conclusion Dr. Patton drew therefrom; she seems to attribute difficulties with self-care to the loss of his mother, not intellectual limitations.

Similarly, Dr. Patton's reliance on Salad's. reported failure to learn how to fish is suspect due to conflicting evidence, and warrants further examination as to whether his failure to do so is properly attributed to intellectual disability. As an initial matter, the interview reports are contradictory as to whether Salad failed to learn how to fish, or that he could fish, but was not good at it. *Compare* Def. Ex. 6P, "Interview of Mohamed Farah Bile" ("Ahmed did not know how to fish and we never let him go to sea because of fears for his safety."), *and id.*, "Interview with Muhidi Salad Omar aka 'Gurdan'" ("Gurdan and [Ahmed] were both fishermen, but [Ahmed] was not good at fishing.") *with* Gov't Ex. S, Narrative Background of Salad, 11 ("Ahmed said he was a good fisherman and had taught himself how to swim on the coast."). Assuming *arguendo* that Salad could not fish,[36] this fact does not constitute evidence that his inability stemmed from intellectual disability: it seems reasonable that a nomad from an arid region may struggle to learn how to swim and fish, especially in light of co-defendant Omar's testimony at the *Atkins* hearing that a number of men who came to the sea similarly could not learn how to fish, and that Salad was afraid to fish because he could not swim. *See* Hr'g Test. of Mr. Omar (May 10, 2013).[37]

With respect to Salad's service in the Puntland militia, the Darawish, and the Presidential Guard, the defense attempts to paint Salad as an unskilled guard who learned little more than how to hold and clean an AK–47. *See* Def. Supp. Mem. at

**36.** Fishing, in this context, appears to refer to lobster fishing, which involves putting nets and equipment in the sea and retrieving them at a later time. As the defense's own narrative background, prepared by Linda McGrew, an investigator with the Federal Public Defender, describes it, "[l]obster fishing is tough work and sometimes risky when you are putting your nets and equipment down under water. Men do not always come back up again if they dive too deep or do not know how to swim." Gov't Ex. S at 11.

**37.** Mr. Omar's testimony provides one of the most striking examples of the unreliability of statements found in the interview reports of the co-defendants submitted by the Federal Public Defender. *See supra* note 31. The interview report of Mr. Omar stated "[l]ots of [other men] came ... and learned how to fish and became very good at it;" however, when questioned during the hearing, Mr. Omar stated that "there were some who learned how to fish and there were others who were just about the same, like [Salad]." *Compare* Def. Ex. 6P, "Interview with Muhidin Salad Omar aka 'Gurdan'" *with* Hr'g Test. of Mr. Omar (May 10, 2013). In the same vein, the defense offered co-defendant Ali's interview report as support for the claim that Salad was slower than the other pirates on the mission because he could not operate the GPS unit he brought to the *Quest*, nor could he help fix mechanical problems on their boat. *See* Def. Ex. 6P, "Interview with Mohamud Salad Ali." However, when questioned at the hearing, Mr. Omar admitted that he also was ignorant of how to use the GPS unit, nor could he assist in boat repairs; thus, it is unremarkable that Salad possessed these same limitations. Mr. Ali's testimony also contradicted statements in his interview report with respect to whether he had awareness of how soldiers are promoted within the militia. His interview report states that "[o]ne could get promoted quite easily if you could adapt to learning new things;" however, at the hearing, Mr. Ali stated he was unfamiliar with the Darawish and had no knowledge of requirements for promotion. *Compare id. with* Hr'g Test. of Mr. Ali (May 10, 2013). Such inconsistencies permeated the co-defendants' testimony at the hearing, and cast further doubt on the reliability of the interview reports. *See supra* Part V.B.i.

5–8; Def. Ex. 6P "Second Interview of Abdirisaq Said Bare (Madoobe Bakayle)." The United States highlighted contradictory statements from Salad's commander in the militia that he was a "hero" who engaged in front-line combat. *See* Gov't Ex. S at 19. Again, assuming *arguendo* Salad did not advance in the Darawish and merely held the position of guard, this fact does not assist the defense in demonstrating that Salad has significant deficits in adaptive functioning. Indeed, there is nothing noteworthy about the fact that Salad may have been a poor shot or required additional training to handle his AK–47.[38] As Salad's friend in the militia who was interviewed by Mr. Hussein stated, "[Salad] *and some other boys* were getting extra help to operate the gun and understand how to follow directions." Def. Ex. 6P "Second Interview of Abdirisaq Said Bare (Madoobe Bakayle)" (emphasis added). Given the defense's own evidence, Salad appears not to be unique in that he required additional assistance in learning skills required of him while serving in the Darawish.

Additionally, the court can draw no conclusion in the Defendant's favor with respect to adaptive skills functioning from the assertion that he was not a leader in the militia and did not receive specialized training,[39] despite the fact that he was made a member of the Puntland Presidential Guard. The defense alleges that Salad's promotion to the Puntland Presidential Guard was a matter of clan politics rather than any special skills he exhibited. Even assuming the veracity of the anecdotal evidence from Dr. Johnson that the Presidential Guard was not an elite force,[40] Salad's inclusion in that force certainly does not weigh in favor of a finding of intellectual disability.

Thus, granting the proposition that Salad's roles in the militia and the Presidential Guard are not *necessarily* incompatible with one who has significant deficits in practical or conceptual adaptive skills, this evidence fails to further the defense's *At-*

---

**38.** With respect to the fact that Dr. Patton highlighted, in his second report, the incident when Salad was a young teenager living in Qardho and accidentally fired an AK–47, he uses this as an illustration that the Defendant "did not display safe behavior" and states it is "reflective of and consistent with someone who shows poor insight and judgment." Patton Letter Report at 4. Although this may be the case, it is not dispositive or convincing to the court when viewed in light of numerous contradictory statements. *See* Def. Ex. 6P, "Second Interview of Hawa Muse Salad" at 2 ("Ahmed did not have any problem with ... his safety[.]"); *id.*, "Second Interview of Abdirisaq Said Bare (Madoobe Bakayle)" at 1 ("Ahmed did his best to look after his safety even though sometimes we saw him forget to unload his gun so we reminded him, but this was not very frequent that this happened."); *id.*, "Interview of Nasro Abdi Mohamed" at 2 ("[Ahmed] was safe in traffic"). The accidental firing of the AK–47 may be merely an isolated instance of irresponsible behavior, and, even given the challenges of this case,

the court is mindful of the AAIDD Manual's admonition against drawing conclusions from such events. *See* AAIDD Manual at 48.

**39.** Presumably hundreds of Somali soldiers are similarly situated to the Defendant.

**40.** The description of Salad's time in the Presidential Guard included in the narrative background created by the defense team weighs against this assumption: "In August 2007, [Ahmed] was part of the presidential guard that accompanied President Adde Muse by plane to Mogadishu for a meeting with the Somali President Abdulahi Yusuf. Ahmed said the pay for the presidential guard was higher than the regular [militia].... This trip was the first and only time Ahmed traveled outside of Puntland. He had never been on an airplane before and thought Mogadishu was a beautiful city." Gov't Ex. S at 12. The court is dubious that an intellectually disabled guard would accompany the President of Puntland on a diplomatic mission to another region.

*kins* claim, for which they bear the burden of proof by a preponderance of the evidence. In sum, the weight of the evidence on this issue indicates that Salad was an adequate soldier in the militia and Presidential Guard for approximately ten years of his life, not that he suffered from significant practical adaptive skills impairments.

### iii. Evidence of Post–Arrest Adaptive Skills

Having considered Dr. Patton's conclusions regarding Salad's adaptive skills before the age of eighteen, the court will now briefly address the evidence, largely presented by the United States, regarding Salad's adaptive skills as observed after his arrest. Dr. Patterson considered this evidence, along with a variety of additional information and his interview of the Defendant, in opining, to a reasonable degree of medical certainty, that Salad does not demonstrate deficits in adaptive functioning due to intellectual disability. *See* Gov't Supp. Mem. at 13.

First, as Federal Bureau of Investigation ("FBI") Special Agent Eric Perry testified at the hearing, in Salad's initial interview with the FBI following his arrest, he responded, through an interpreter, to a variety of personal background questions. He provided information regarding his entire family, including clan and sub-clan affiliation; his cell phone number, including the service provider; and the area in which he lived in Somalia. *See* Gov't Supp. Mem. at 2. He also requested he be permitted to divorce his wife because he knew he was in trouble and would be absent for some time. *Id.*

In a subsequent interview, after Salad had waived *Miranda* warnings and signed a translated document to that effect, he responded to questions regarding his involvement in the attack of the *Quest,* stating that he was merely a guard, that he was asleep when shooting began on the final day, and he identified a number of co-

defendants by name. *Id.* A few days later, Salad refused to speak with the agents when they attempted to conduct a second interview. *Id.* The court is mindful that an invocation of *Miranda* rights is not inconsistent with intellectual disability. *See Walker v. Kelly,* 593 F.3d 319, 334 (4th Cir.2010) (Gregory, J. dissenting). However, Salad's post-arrest behavior is not necessarily inconsistent with that of an individual without significant adaptive skills deficits. Thus, this evidence does not conclusively weigh for or against a finding of intellectual disability.

Likewise, the United States places great emphasis on Salad's abilities while in jail to (1) procure a trustee job, assisting with janitorial tasks; (2) place international phone calls to his wife and others in Somalia; and (3) make various requests (to be placed in an English as a Second Language class, attend Muslim prayer classes, etc.). The court does not find that this evidence *precludes* a finding of intellectual disability, nor does it *compel* a conclusion to the contrary. Given the weight of case law and the AAIDD User's Guide's admonitions that "diagnosis of [intellectual disability] is not based on the person's 'street smarts', behavior in jail or prison, or 'criminal adaptive functioning[,]' " the court finds the United States' emphasis on these factors misplaced. AAIDD, *User's Guide* 20 (11th ed. 2012); *see also United States v. Davis,* 611 F.Supp.2d 472, 494–95 (D.Md.2009); Def. Exs. 6M, 6R. In short, the United States overplays the case with respect to this evidence garnered while Salad has been incarcerated, and the court affords it little weight. Nevertheless, Dr. Patterson opined, and the court agrees, that none of Salad's behavior after arrest and while incarcerated affirmatively supports or indicates significant adaptive skills deficits.

887

## D. Synopsis

The evidence before the court regarding Salad's adaptive skills falls far short of establishing that he has deficits in *any* area of adaptive functioning. Although the court commends Dr. Patton for his ambitious efforts to create a baseline understanding of a nomadic Somali's skill level, the significant inconsistencies throughout the interview reports and their inherent unreliability cast a long shadow on the conclusions Dr. Patton draws therefrom. *See supra* Part V.B.i; notes 31, 37, 38 and accompanying text (describing inconsistencies in testimony from co-defendants at the hearing and statements in the interview reports). Moreover, Dr. Patton claims to have focused on the convergent validity of statements in the reports; however, the record before the court suggests that he may have selectively focused on statements favorable to a determination of adaptive skills deficits, while not affording adequate consideration to those that did not comport. Nor does it appear that he adequately considered alternative explanations for the Defendant's reported shortcomings, as offered by Dr. Patterson's credible testimony. Salad has not met his burden with respect to adaptive skills deficits.

## VI. PRONG THREE: ONSET BEFORE AGE EIGHTEEN

Having concluded that the Defendant does not have significant limitations in adaptive skills or intellectual functioning, the court does not address prong three. *See, e.g., United States v. Candelario–Santana,* 916 F.Supp.2d 191, 219–21 (D.P.R. 2013).

## VII. CONCLUSION

To summarize, the court finds that Salad failed to prove by a preponderance of the evidence that he suffers from significant deficits in intellectual functioning or adaptive skills. Thus, he is determined not to be intellectually disabled, and is, therefore, eligible for the death penalty, if so imposed by the jury. *See* 18 U.S.C. § 3593 (jury determines a sentence of death or life imprisonment without the possibility of release pursuant to federal statute). Accordingly, the Defendant's *Atkins* Motion is **DENIED.** The Clerk is directed to forward a copy of this Opinion to counsel for the Defendant and to the United States Attorney at Norfolk.

**IT IS SO ORDERED.**